# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

**PRO ACTIVE SAFETY SYSTEM P.A.S.S. LLC.,**
**DAVID BARNARD**

**CASE NUMBER_____**

    **Plaintiff,**

       **vs.**

**SIEMENS GAMESA RENEWABLE ENERGY, LLC.,**

    **Defendants.**

_____/

## COMPLAINT

    **COMES NOW**, Plaintiff, PRO ACTIVE SAFETY SYSTEM P.A.S.S. LLC., (hereinafter PRO ACTIVE) by and through its attorneys and sues Defendant, SIEMENS GAMESA RENEWABLE ENERGY, LLC., (hereinafter SIEMENS) for Breach of Contract, Declaratory Judgment for violation of the Florida Deceptive and Unfair Trade Practices, Tortious Interference with a Business Relationship, Unjust Enrichment and Account Stated for money damages, and allege as follows:

## INTRODUCTION

1. This is an action for Breach of Contract, Declaratory Judgment for violation of the Florida Deceptive and Unfair Trade Practices, Tortious Interference with a Business Relationship, Unjust Enrichment and Account Stated for money damages in excess of $100,000.

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over this dispute because this Complaint seeks damages which exceed One Hundred Thousand Dollars ($100,000.00) and seeks injunctive relief. The Contract

at issue in this case, Exhibit A, clearly states that suit must be brought in the United States District Court for the Middle District of Florida. The Plaintiff is a resident and a Florida Corporation, and the Defendant is a Delaware Corporation and there is complete diversity of citizenship.

3.      Venue is proper in the Middle District of Florida because Plaintiff, DAVID BARNARD is a resident of the Middle District of Florida and **PRO ACTIVE SAFETY SYSTEM P.A.S.S. LLC.,'s (hereinafter PRO ACTIVE)  principal place of business is in the Middle District of Florida.**

4.      Defendants, SIEMENS GAMESA RENEWABLE ENERGY, LLC.,    (hereinafter SIEMENS) is a Delaware Corporation that operates and/or conducts business in Brevard County, Florida; and/or the cause of action against all Defendants accrued in Brevard County, Florida.

## <u>SWORN FACTS APPLICABLE TO ALL COUNTS</u>

5.  DAVID BARNARD is the owner of PRO ACTIVE SAFETY SYSTEM P.A.S.S. LLC., Inc., and is filing an Affidavit incorporated in this Complaint, which provides some of the factual allegations for this Complaint. The Affidavit states:

[m]y name is **DAVID BARNARD,** I am an adult under no legal disability, and I provide this Affidavit freely and of my own accord based on personal knowledge, and I make this Affidavit of penalty of perjury.

I am the Owner of PRO ACTIVE SAFETY SYSTEM P.A.S.S. LLC. since 2009. PRO ACTIVE and SIEMENS entered into a multi-year contract in 2018 which is attached to this Complaint as Exhibit A is a true and correct copy of the Contract at issue in this case.

The contract states in section "14.4 – Non-Solicitation: "During the term of the Agreement and for a period of twelve (12) months following its termination or expiration, each Party agrees not to solicit, entice away, or engage (directly or indirectly), whether as an employee, consultant, contractor or otherwise, any person who is or was employed or engaged by the other Party in connection with the Services without the prior written consent of the other Party." (See Exhibit A). This type of restraint on commerce has been upheld as valid pursuant to Florida Statute 542.335 (Florida Statutes).

SIEMENS GAMESA RENEWABLE ENERGY, LLC., has conspired in unfair trade practices in the State of Florida and other states and solicited and hired employees from PRO ACTIVE  in direct violation of the Contract attached hereto without written consent.

A partial list of employees that SIEMENS improperly solicited and hired from PRO ACTIVE from 2022 to present include but are not limited to: (1) Chris Mendez; (2) Dylan Mendez; (3) Roscon Ramiro; (4) Craig Kalchi; (5) Jeremis Perryman; (6) Jonathan Zavala; (7) James Bonham; and (8) Amanda Mcaulay; (9) and others not identified herein.

PRO ACTIVE was harmed when SIEMENS improperly solicited and hired these employees and others costing PRO ACTIVE money damages in lost training, lost revenues, and other damages. SIEMENS had a policy or practice where SIEMENS would identify PRO ACTIVE employees who were of particular value or talent, and SIEMENS would then solicit and hire these employees away from PRO ACTIVE without its consent. SIEMENS then charged PRO ACTIVE approximately $10,000 per employee to train new PRO ACTIVE employees to replace the ones SIEMENS improperly solicited and hired.

In one instance, Brian Villarreal, who was solicited and hired by SIEMENS demanded that SIEMENS pay for the training of his PRO ACTIVE replacement employee. PRO ACTIVE complained to SIEMENS about soliciting and hiring PRO ACTIVE employees in direct violation of the Contract and was told by SIEMENS management that if they did not like SIEMENS soliciting and hiring PRO ACTIVE employees in violation of the Contract that PRO ACTIVE could sue SIEMENS.

SIEMENS also engaged in a classic bait and switch tactic with the consumer PRO ACTIVE in the following manner. When PRO ACTIVE initially contracted with SIEMENS, in 2018, it was understood that PRO ACTIVE employees would require specific training approved by SIEMENS. SIEMENS had a list of trainers which allowed PRO ACTIVE employees to receive the proper training approved by SIEMENS from third parties at a low cost, which was the bait to keep PRO ACTIVE as a consumer and contractor and to sign the Contract.

The Contract at issue in this case Exhibit A, has a specific page attached as Exhibit D to that Contract entitled "Training Course Requirements which states "[t]echnicians shall be certified as trained in safety & technical classes at all times during the provision of Services, and such certifications must be current at the time Services are performed."  (See Exhibit A, page 31).

When the Contract initially began in 2018, PRO ACTIVE would pay approximately $1500 to $2000 to train employees in compliance with the SIEMENS contract. After SIEMENS began to solicit and hire PRO ACTIVE employees who had been trained by PRO ACTIVE, and whose training had been paid for by PRO ACTIVE, SIEMENS than changed the training requirements for new PRO ACTIVE employees and now demanded that PRO ACTIVE pay SIEMENS approximately $10,000 per employee for SIEMENS to train new employees that would meet the new requirements of SIEMENS. Shockingly, PRO ACTIVE incurred this $10,000 cost to train new hires to replace employees SIEMENS solicited and hired in direct violation of the Contract. This conduct violated Florida Deceptive and Unfair Trade Practices and was one of the direct harms suffered by PRO ACTIVE as a result of SIEMENS conduct described herein.

IN 2022 and in 2023 SIEMENS switched the training requirements so that only SIEMENS could provide the training to PRO ACTIVE employees and then raised the cost to around $10,000 per employee to be trained, paid to SIEMENS by PRO ACTIVE .  SIEMENS engaged in an unfair and deceptive business practice when it changed the training policies which required SIEMENS to provide the training to PRO ACTIVE employees at costs of five or six times the fair market costs of such training, which was in violation of Florida's Deceptive and Unfair Trade Practices Act, and specific instance of price gouging.

KIP WOODWORTH, Resource Manager employed by PRO ACTIVE tried to resolve this issue with SIEMENS and was told that paying SIEMENS $10,000 to train employees was now the only option PRO ACTIVE could use to train employees per the Contract.

After PRO ACTIVE paid SIEMENS around $10,000 per employee to train PRO ACTIVE employees, SIEMENS then improperly solicited and hired those employees from PRO ACTIVE causing money damages to PRO ACTIVE. This conduct, and the other conduct described herein is  an "unfair practice," within meaning of the Florida Deceptive and Unfair Trade Practices Act, and offends established public policy, is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, which include PRO ACTIVE.

In the scenario described herein, SIEMENS was the seller of employee training certifications and PRO ACTIVE was the consumer of the certifications which were priced at five or six times what training should

have been priced. SIEMENS forced PRO ACTIVE to pay SIEMENS for employee training at inflated values while specifically not allowing third parties to provide the training at a lower cost, as had been done in the past.

SIEMENS has also refused to pay approximately $200,000 in invoices owed to PRO ACTIVE for work that PRO ACTIVE has already performed. SIEMEN'S failure to pay PRO ACTIVE has caused PRO ACTIVE irreparable harm and loss of additional employees.

SIEMENS GAMESA RENEWABLE ENERGY LIMITED, LLC., has engaged and are engaging in Unfair Trade Practices Act (FDUTPA), sections 501.201-.213, Florida Statutes, whose intended purpose is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2) Florida Statutes (2024), and 15 USC section 45(a)(1).

I am asking that this Honorable Court enter an Injunction to stop SIEMENS GAMESA RENEWABLE ENERGY LIMITED, LLC., and or their parent or related companies, and from utilizing any trade secrets, proprietary information, employee information, client lists, client information, trade secrets, and any and all information taken from PRO ACTIVE SAFETY SYSTEM P.A.S.S. LLC., and further tortiously interfering with PRO ACTIVE SAFETY SYSTEM P.A.S.S. LLC.'s, business relationships and violating the Florida Deceptive and Unfair Trade Practices Act.  I am demanding payment in full for all monies owed to Plaintiffs, costs, interest, attorneys fees and all other remedies available under the law.

I, the said **DAVID BARNARD**, of full age and legally competent, affirm under penalty of perjury, that the foregoing attestations by me are true, correct, and done so in good faith to the best of my knowledge. I am aware that if any of the foregoing statement is made by me are willfully false, I am subject to punishment.

*See Affidavit,* Exhibit A.

## <u>COUNT I: BREACH OF CONTRACT</u>

6.   The Plaintiff reaffirms and realleges paragraphs one (1) through five (5) as fully incorporated and set for in.

7.   The Plaintiff, PRO ACTIVE had a Contract with SIEMENS to perform services, which is attached to this Complaint as Exhibit A. PRO ACTIVE performed all material terms of the Contract and SIEMENS has refused to pay PRO ACTIVE for the services in Breach of Contract. SIEMENS owes PRO ACTIVE over $200,000 for past invoices, costs attorneys and interest. PRO ACTIVE  has suffered damages as a result of SIEMENS failure to pay as described herein.

8.   SIEMENS also breached the Contract when it improperly solicited and hired PRO ACTIVE employees and improperly changed the training requirements for PRO ACTIVE employees as described herein.

4

**WHEREFORE**, the Plaintiff prays this Honorable Court award money damages to PRO ACTIVE for Breach of Contract as alleged herein and award costs, attorneys' fees and all other relief that is just and proper.

### COUNT II: VIOLATION OF FDUTPA

9. The Plaintiff reaffirms and realleges paragraphs one (1) through five (5) as fully incorporated and set for in.

10. The Plaintiff sues SIEMENS for unfair and deceptive trade practices under the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), sections 501.201-.213, Florida Statutes, (2020) whose intended purpose is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2). An "unfair practice" under Florida Deceptive and Unfair Trade Practices Act (FDUTPA) is one that offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious . . . . A claim for damages under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA) has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.

11. Here SIEMENS violated FDUTPA when it engaged in bad faith bait and switch tactics by baiting the consumer PRO ACTIVE into a business relationship and then switching the training requirements for PRO ACTIVE employees by requiring SIEMENS to provide all training at a cost five or six times the amount of what training had cost in the past and should have cost.

12.  SIEMENS also solicited talented PRO ACTIVE employees and then hired those talented employees in direct violation of the Contract and the FDUTPA, even though PRO ACTIVE had trained  and or paid SIEMENS to train those valued employees.

13. To add insult to injury SIEMENS then required PRO ACTIVE to pay SIEMNS approximately $10,000 per employee to train NEW PRO ACTIVE employees who were hired to replace those hired by SIEMENS in direct violation of the contract provisions described herein.

14. The Plaintiff prays for money damages and a temporary and permanent injunction based on the fact that: (1) the Defendants' conduct is illegal, ongoing and escalating; (2) the Plaintiff will suffer irreparable harm if the Defendants are not prohibiting from continuing to engage in the conduct complained of herein; and (3) there is no adequate remedy at law.

**WHEREFORE**, the Plaintiff prays this Honorable Court grant the injunction requested herein, and Order SIEMENS to cease and desist from:  (1) contacting current employees in an attempt to steal those employees for employment; (2) from using proprietary and other information improperly obtained in an attempt to steal PRO ACTIVE SAFETY SYSTEM P.A.S.S. LLC.,'s; (3) to cease and desist conspiring to steal confidential information, clients, employees, client lists and other proprietary information from PRO ACTIVE SAFETY SYSTEM P.A.S.S. LLC.,, LLC., and award costs, money damages, and attorney's fees, against all named Defendants and all other relief that is just and proper.

## COUNT III: TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP

15. The Plaintiff reaffirms and realleges paragraphs one (1) through five (5) as fully incorporated and set for in.

16. The Plaintiff sues Defendant SIEMENS GAMESA RENEWABLE ENERGY, LLC., for tortious interference with a contract or business relationship, with the elements being: (1) the existence of a business relationship between the plaintiff and a third person, not necessarily evidenced by an enforceable contract, under which the plaintiff has legal rights; (2) the defendant's knowledge of the relationship; (3) an intentional and unjustified interference with the relationship by the defendant which induces or otherwise causes the third person not to perform; and (4) damage to the plaintiff resulting from the third person's failure to perform. *See Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So.2d 381, 385 (Fla. 4th DCA 1999); RESTATEMENT (SECOND) OF TORTS § 766 (1979).

17. Here, the Defendants have conspired with others named herein to work for SIEMENS and converted this information for the benefit of SIEMENS, causing harm to Plaintiff.

18. SIEMENS has illegally, improperly, interfered with Plaintiffs business relationship with its employees by improperly soliciting and hiring PRO ACTIVE employees in direct violation of the Contract. Plaintiff seeks all money damages allowed by law and injunctive relief, costs, and interest.

**WHEREFORE**, the Plaintiff prays this Honorable Court award costs, money damages, and attorney's fees, and all other relief that is just and proper against Defendant, SIEMENS.

## COUNT IV: UNJUST ENRICMENT

19. The Plaintiff reaffirms and realleges paragraphs one (1) through five (5) as fully incorporated and set for in. This count is in the alternative to the other counts brought herein.

20. The Plaintiff, PRO ACTIVE had a Contract with SIEMENS to perform services, which is attached to this Complaint as Exhibit A. PRO ACTIVE performed all material terms of the Contract and SIEMENS has refused to pay PRO ACTIVE for the services in breach of its

Contract. SIEMENS owes PRO ACTIVE over $200,000 for past invoices, costs attorneys and interest. PRO ACTIVE has suffered damages as a result of SIEMENS failure to pay as described herein.

21. SIEMENS has been unjustly enriched by improperly refusing to pay PRO ACTIVE, who has suffered monetary losses in excess pf $200,000 as a direct result of SIEMENS refusal to pay. PRO ACTIVE demands the greater of (1) the market value of the services performed or (2) the value of the services provided to SIEMENS.

**WHEREFORE**, the Plaintiff prays this Honorable Court award money damages to PRO ACTIVE for unjust enrichment as alleged herein and award costs, attorneys' fees and all other relief that is just and proper.

### COUNT V: ACCOUNT STATED

22. The Plaintiff reaffirms and realleges paragraphs one (1) through five (5) as fully incorporated and set for in. This Count is brought in the alternative to the other Counts alleged herein.

23. The Plaintiff, PRO ACTIVE had a Contract with SIEMENS to perform services, which is attached to this Complaint as Exhibit A. PRO ACTIVE performed all material terms of the Contract and SIEMENS has refused to pay PRO ACTIVE for the services in Breach of Contract. SIEMENS agrees that it owes PRO ACTIVE over $200,000 for past invoices, costs attorneys and interest. PRO ACTIVE has suffered damages as a result of SIEMENS failure to pay as described herein.

24. PRO ACTIVE has a valid account stated for the amount of $186,202.00 plus interest as attached as Exhibit B to this Complaint which SIEMENS is liable for this amount has been owed since March 27th, 2025.

**WHEREFORE**, the Plaintiff prays this Honorable Court award money damages to PRO ACTIVE for Account Stated as alleged herein and award costs, attorneys' fees and all other relief that is just and proper.

**s//Gary Holland//**
Gary Holland, ESQ.
Florida Bar No.:860610
997 S. Wickham Road
Melbourne, Florida 32904
Phone: (321) 728-4911
garyholland@brosslawoffice.com
susan@brosslawoffice.com
paul@brosslawoffice.com

SIEMENS

WORK AND SERVICES TERMS AND CONDITIONS

AGREEMENT Between

SIEMENS GAMESA RENEWABLE ENERGY, INC.

("SGRE") and

Proactive Safety System LLC, d/b/a HSE Safety Partners LLC
("CONTRACTOR")

**Table of Contents**

DEFINITIONS.................................................................................................................................3

SIEMENS

1. AUTHORITY AND COMMUNICATIONS ........................................................................... 6

2. TERM .............................................................................................................................. 6

3. INSPECTION ................................................................................................................... 6

4. TERMS OF PAYMENT ..................................................................................................... 7

5. SCHEDULE/COMPLETION ............................................................................................. 7

6. FORCE MAJEURE ........................................................................................................... 8

7. TITLE AND RISK OF LOSS ............................................................................................. 8

8. CHANGES ....................................................................................................................... 8

9. ASSIGNMENT AND STATUS .......................................................................................... 9

10. INTELLECTUAL PROPERTY RIGHTS ............................................................................ 9

11. INTELLECTUAL PROPERTY INDEMNIFICATION ....................................................... 10

12. PROTECTION OF INFORMATION ................................................................................ 10

13. COMPLIANCE ............................................................................................................... 10

14. SUSPENSION OF WORK .............................................................................................. 13

15. TERMINATION ............................................................................................................. 13

16. SUBCONTRACTING ..................................................................................................... 15

17. WARRANTY .................................................................................................................. 15

18. RESOLUTION OF CONFLICTS OR INCONSISTENCIES OCCURRING IN THIS AGREEMENT .... 15

19. DISPUTE RESOLUTION ............................................................................................... 16

20. TAXES .......................................................................................................................... 16

21. INSURANCE AND INDEMNITY .................................................................................... 16

22. SGRE FURNISHED PROPERTY ................................................................................... 18

23. NONEXCLUSIVE REMEDIES ....................................................................................... 19

24. SITE CONDITIONS ....................................................................................................... 19

25. EXAMINATION OF BOOKS AND RECORDS ................................................................ 20

26. NEWS, PUBLICITY OR ADVERTISING RELEASES ..................................................... 20

27. GOVERNING LAW ........................................................................................................ 20

# SIEMENS

28. GOVERNMENT ORDERS .................................................................................................20

29. CONGRESSIONAL ACT COMPLIANCE.....................................................................20

30. MILITARY SECURITY REQUIREMENTS ...................................................................21

31. EXAMINATION OF RECORDS ....................................................................................21

32. NOTICE OF LABOR DISPUTES ..................................................................................21

33. NONDISCRIMINATION IN EMPLOYMENT .............................................................21

34. WORK HOURS ACT OF 1962 ......................................................................................21

35. WALSH-HEALY PUBLIC CONTRACTS ACT ...........................................................21

36. DAVIS-BACON ACT (40 U.S.C. 276a-276-a-7)..........................................................22

37. COPELAND ("ANTI-KICKBACK") ACT .....................................................................22

38. PATENT INDEMNITY...................................................................................................22

39. FEDERAL ACQUISITION REGULATION...................................................................22

This WORK AND SERVICES TERMS AND CONDITIONS AGREEMENT ("Agreement") is entered into as of _July 23rd_____, 2018__ (the "Effective Date"), by and between **SIEMENS GAMESA RENEWABBLE ENERGY, INC.** ("SGRE"), a Delaware corporation, having an office at 3500 Quadrangle Blvd., Orlando, FL 32817, and ___ Proactive Safety System LLC, d/b/a HSE Safety Partners LLC ("Contractor"), a [_____] limited liability company, having an office at _1322 Vater NW Palm Bay, FL 32907_____.

SGRE and Contractor are referred to herein individually as a "Party" and collectively as the "Parties". In exchange for mutual consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound, the Parties agree to the following:

## DEFINITIONS

**"Affiliate"** means, as to a specified Person, any other Person that, directly or indirectly, controls or is controlled by or is under common control with the Person in question and, with respect to SGRE or Contractor, is not a competitor of, or in litigation with, SGRE or Contractor, as the case may be.

**"Confidential Information"** means all written, recorded, electronic or oral materials, information and/or data (including copies or restatements thereof) relating to, without limitation, the Intellectual Property, Know How, businesses, operations, finances, pricing, forecasts, projections, analyses, employees, commercial, marketing, research and development, or other plans and strategies, customers and/or vendors of a Party hereto, regardless of whether marked "Confidential" or "Proprietary", and any other information furnished by or through a Party and

**SIEMENS**

identified as "Confidential" or "Proprietary", including, in each instance, all copies thereof and all portions of documents containing confidential information.

"**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise, including the ability to elect the members of the board of directors or other governing body of such person, and the terms "controlled" and "controlling" have meanings correlative thereto.

"**Disclosing Party**" means a Party providing Confidential Information either directly or through an Affiliate or Representative.

"**Intellectual Property**" means ideas, inventions, discoveries, processes, methods, designs, Know How, strategies, techniques, formulas, specifications, computer programs including software (in source and object code forms), firmware and related operating instructions and documentation, trademarks, service marks, and work products and works of authorship of all kinds, including notes, reports, memoranda, writings, plans, outlines, research, data, figures, descriptions, drawings, diagrams, charts, sketches, patterns, compilations, lists, surveys, interview guides, and recordings (in each case, in any form or medium and whether or not patentable, reduced to practice or copyrightable).

"**Intellectual Property Rights**" includes, without limitation, all rights with respect to Know-How, copyrights, trademarks, trade secrets, patents, domain names, rights of publicity or rights of privacy.

"**Know How**" means all technical information, knowledge, expertise and inventions and works of authorship that are owned, developed, issued to, licensed by, licensed to, or used by a Party or a Party's Affiliates, including, without limitation, information comprised in formulae, techniques, designs, specifications, drawings and associated data, design manuals, design rules, design standards, components, lists, manuals, instructions, catalogues, computation models, process descriptions, process manuals, trials, experiments, research and technology results, statistics and data, relating to (without limitation) the composition, production, manufacture, design, development, use, repair, maintenance, monitoring, recording and controlling of any product, process or service, including any such information relating to tooling design and quality control, and software (object and source code), data and related documentation, and all copies and tangible embodiments in whatever form or medium, all to the extent this Know How is not protected by patents.

"**Mobilization/De-mobilization**" means Technician(s) traveling from their place of permanent residency to a shortterm residence located near the Work site and then returning to their place of permanent residency.

"**Person**" or "**Persons**" means any individual, corporation, partnership, limited liability company, association, joint stock company, trust, unincorporated organization, joint venture, government or political subdivision or agency thereof. "**Purchase Order**" shall mean the purchase order issued by SGRE to Contractor, and any attachments, drawings, specifications or other documents that are incorporated by reference, as it may be amended, modified or supplemented from time to time in accordance with the terms thereof.

"**Recipient**" means a Party receiving Confidential Information, either directly or through an Affiliate or Representative.

"**Representatives**" means each Party's directors, officers, employees, agents, representatives and/or subcontractors.

"**Scope of Work ("SOW")**" means any statement of Services or expected deliverables, project plan, or project documentation issued by SGRE or any of its Affiliates under this Agreement issued independently, through a Purchase Order or otherwise, specifying (i) this Agreement; (ii) the name and address of SGRE or its Affiliate for whom the Services will be performed; (iii) detailed tasks, deliverables and acceptance criteria to be applied to each deliverable; (iv) personnel to be provided by Contractor; (v) project assumptions and a schedule for fulfillment of Services; (vi) fees and payment schedule applicable to the SOW; (vii) designated start and completion date(s); and (viii) any other specific terms and instructions with respect to the Services to be provided under the SOW.

SIEMENS

---

"**Services**" means the tasks and deliverables to be provided or performed by Contractor as set forth in Exhibit A, General Statement of Services, attached hereto, and as more precisely stated in an SOW and Purchase Order issued by SGRE or any of its Affiliates under this Agreement.

"**Work**" shall mean labor, Services, materials, supplies, objects, equipment, information, software, systems, data, drawings, designs, specifications, or reports furnished by Contractor to SGRE in accordance with this Agreement.

"**Specifications**" means SGRE's or its Affiliate's required features, functional or user requirements for the Services or deliverables as more fully described in the SOW.

"**Technician(s)**" means a trained technician certified by Contractor to be capable of performing the assigned Scope of Work.

---

SIEMENS

---

## 1. AUTHORITY AND COMMUNICATIONS

A)      Whenever the word SGRE or reference to SGRE appears in this Agreement with respect to authorization for such items as assignment, subcontracting, substitutions, extras, changes, termination, cancellation, claims, and authorizations, the word or reference is deemed to only mean SGRE's authorized purchasing representative. Claims by Contractor for adjustments, changes, increases or deletions to the Work, terms and conditions, schedule, price or payment will not be allowed unless authorization shall have been duly granted in writing prior to implementation by SGRE's authorized purchasing representative.

B)      All written communications, submittals or other official documentation must be directed to SGRE's authorized purchasing representative and shall reference this Agreement and/or the Purchase Order number. The entire agreement between SGRE and Contractor is set forth in this Agreement and the Parties are not bound by any other agreements, understandings or conditions otherwise than as expressly set forth and stipulated hereunder; any amendment to, or waiver or modification of, any of the terms and conditions of this Agreement shall only be valid when done in writing and signed by both SGRE and Contractor.

C)      All notices required or permitted to be given under this Agreement may be given by either Party by post, facsimile or electronic mail and shall be directed by one Party to the other at its respective address stated in this Agreement and/or in the Purchase Order. The address of either Party may be changed by written notice to the other. Any notice by either Party shall be deemed to have been given and received within thirty-six (36) hours after the same has been mailed in the manner stated above.

D)      The Contractor has no authority whatsoever, express or implied, to commit SGRE in any way to perform in any manner or to pay money for services or materials.

E)      In the performance of the Work hereunder, Contractor shall act solely as an independent contractor and nothing herein contained or implied will at any time be so construed as to create the relationship of employer and employee, partnership, principal and agent, or joint venturer as between SGRE and Contractor. Contractor shall provide control, supervision, direction and take responsibility for any and all Work performed under this Agreement.

## 2. TERM

The initial term of this Agreement shall commence on the Effective Date and shall end on the _23rd_ day of __July_____, 2018___. In addition to the termination provisions provided in Article 15, Termination, herein, this Agreement will continue in effect from year to year thereafter unless and until either Party provides at least six (6) months advance written notice of termination to the other Party with a termination effective date after _July 24rd_____, 2019_.

## 3. INSPECTION

A)      Contractor's Work shall, during the performance of this Agreement, be subject to inspection and test by SGRE or any of its Representatives as it may designate. The Contractor shall provide all such persons with safe and proper facilities for access to and inspection of the Work at the Work site or other source of supply where any equipment, material or other part of the Work may be located. Contractor shall give SGRE notice of the readiness of the Work or any part of it for any special inspection or test which may be required by this Agreement or by any applicable law or public regulation. No part of the Work as to which any specific inspection is required shall be covered until such inspection has been completed. If such Work is covered before such inspection is completed, then it shall be uncovered and recovered at Contractor's expense.

B)      No inspection, failure to inspect or waiver of inspection on the part of SGRE or anyone acting on its behalf shall relieve Contractor of its duty to complete the Work in full accordance with the requirements of this Agreement. Without limiting any of its other rights or remedies, should it appear at any time prior to final inspection and final payment, whether as a result of any inspections or tests or otherwise, that any part of the Work is defective or does not conform to the requirements of this Agreement, SGRE shall with respect to any such defective or nonconforming Work have the right, at its election, to: (1) require Contractor, within such reasonable time as may be determined by

SIEMENS

SGRE and at Contractor's sole expense, to correct such Work or part thereof, to remove from the site all defective or nonconforming materials and equipment and to repair or replace all property and work of SGRE or of any other contractor which may have been damaged by the defective or nonconforming Work or part thereof by the removal or replacement of same; (2) perform or have performed all Work necessary for the accomplishment of the results stated in this Agreement and withhold or recover from Contractor the cost of such Work; or (3) accept the defective or nonconforming Work or part thereof upon the making of an equitable reduction in the Agreement price. Punch lists shall only be permitted with the express written consent of SGRE, and where so permitted, all punch list items shall be resolved to SGRE's satisfaction and fully completed prior to acceptance of the Work and final payment.

## 4. TERMS OF PAYMENT

A) SGRE will compensate Contractor in accordance with the payment terms set forth herein for this Agreement and/or the Purchase Order. Payment shall be made only upon receipt of Contractor's invoice detailing the request for payment and only when SGRE is able to determine that all Work has been performed in accordance with this Agreement. Any such payment(s), including final payment, shall not relieve Contractor of any liability or obligations Contractor may have, or waive any rights or remedies which SGRE may have.

B) Invoices approved for payment by SGRE shall be paid in U.S. dollars ($) within ninety (90) calendar days from the date of the invoice. Disapproved invoices will be returned to Contractor unpaid for correction and resubmittal. HSE Safety Partners agrees to give (2%) discount on invoices paid within 45 days of invoice.

C) Contractor agrees to participate in the Siemens Electronic Funds Transfer (EFT) program for payment.

D) Should payment or return of unapproved invoices not occur within ninety (90) calendar days of the date of the invoice, Contractor shall notify SGRE and provide a copy of the referenced invoice for resolution.

E) Contractor shall not be entitled to final payment unless and until it has furnished to SGRE such receipts, affidavits, releases of lien, or other evidence as may be necessary to establish to the reasonable satisfaction of SGRE that no lien or claim exists.

F) Contractor shall furnish a monthly statement certifying that all amounts due by Contractor for wages, services and materials furnished by Contractor, including the same for any of its subcontractors, for the month covered by Contractor's invoice(s) have been paid.

G) Contractor's acceptance of final payment shall operate to release and discharge any and all claims of Contractor or any party that may claim by or through it, and any and all liability of SGRE, for payment hereunder or in connection herewith.

## 5. SCHEDULE/COMPLETION

Time is of the essence with respect to Contractor's obligations hereunder. The delivery terms for the Work shall be set forth herein and/or in a Purchase Order. The Contractor shall provide sufficient labor, material, services, management forces, plant facilites and equipment working such hours, including night shift, overtime, weekends and holidays as may be required to assure compliance with the established schedule and/or completion date. If this Agreement and/or a Purchase Order does not specify liquidated damages, then Contractor shall be responsible for SGRE's actual costs and damages resulting from late delivery of the Work. If liquidated damages for delay in delivery or completion are set forth in this Agreement and/or a Purchase Order, Contractor expressly agrees that (a) such liquidated damages were specifically negotiated by the Parties and are in lieu of SGRE's actual damages for delay, which both Parties agree would be difficult or impossible to calculate, (b) such liquidated damages constitute a fair and reasonable estimate of the amount of damages that would be incurred by SGRE in the event of such delays in delivery or completion of the Work in light of anticipated harm, and the difficulties of proof and inconvenience or nonfeasability of obtaining any adequate remedy, (c) such liquidated damages are not intended as and shall not be deemed or construed as penalties, and (d) it waives any right to contest the validity or enforceability of such liquidated

**SIEMENS**

damages. Notwithstanding any such payment of liquidated damages for late delivery, Contractor shall remain obligated to meet the delivery terms.

## 6. FORCE MAJEURE

Should Contractor be delayed in the performance of the Work by any act of God, or other cause beyond its reasonable control, SGRE will, upon the written request of Contractor and by written order, extend the time of completion for a period equal to the length of such delay. In no event shall a strike or similar obstruction of employees or labor organizations of Contractor or any of its subcontractors or suppliers be deemed a Force Majeure event hereunder. No such extension shall be made, however, unless Contractor shall within twenty-four (24) hours after the beginning of such delay, have given SGRE written notice of the delay and the cause thereof. If any Force Majeure delay continues for more than thirty (30) calendar days, SGRE shall have the right, but not the obligation, to terminate the Agreement and SGRE shall be entitled to a refund of any moneys it has paid to Contractor. In the event of any extension of the total time of completion, as provided herein, corresponding adjustments shall be made in any schedules which are a part of this Agreement. The extension of time for completion of the Work, in the manner provided above, shall constitute the sole relief to which Contractor is entitled by reason of any Force Majeure delay and Contractor shall make no claim for compensation or damages by reason of any such delay.

## 7. TITLE AND RISK OF LOSS

A)       Title to all Work completed or in the course of completion and to all materials on account of which any payment has been made shall be deemed transferred to SGRE, but this shall not limit or affect any right or remedy of SGRE, including, but not limited to, its right to require the correction of defective or nonconforming Work or relieve Contractor of any obligation arising under this Agreement.

B)       In the event payments are made by SGRE prior to completion of Work, Contractor shall execute and deliver such security agreements, financing statements and other documents as may be deemed necessary by SGRE to protect its rights herein.

C)       To the maximum extent that such agreement is valid under applicable law, Contractor, for itself, its subcontractors, immediate and remote, and all materialmen, laborers and other parties acting through or under it, agrees that no mechanic's liens, claims or encumbrances shall be filed or maintained by it, them, or any of them against any property of SGRE (and/or any property of a third party wherein such Work may be performed) for any Work done or material furnished for or in connection with the performance of the Work and expressly waives and relinquishes the right to file or maintain any such lien or claim. The Contractor shall, from time to time, at SGRE's request and in any event prior to final payment, furnish to SGRE such receipts, releases, affidavits, certificates and other evidence as may be necessary to establish to the reasonable satisfaction of SGRE that no lien, claim or encumbrance against SGRE's property (and/or any property of a third party) nor right to file any such lien, claim or encumbrance exists in favor of any person whosoever for or by reason of any material furnished, labor performed, or other thing done in connection with the performance of the Work under this Agreement. If SGRE at any time shall have evidence reasonably indicating the actual or probable future existence of any such lien or claim, SGRE may, in addition to any other rights or remedies, retain out of any payment then or thereafter due to Contractor or recover from Contractor an amount sufficient to discharge such lien or claim and to pay all expenses incurred in procuring this discharge.

D)       Risk of loss for the Work or any portion thereof shall pass to SGRE upon completion and SGRE's acceptance of the Work.

## 8. CHANGES

SGRE shall have the right to make changes without notice to the sureties of Contractor, if any, in the Work, either by altering the nature of the same or by adding to or deducting from it. All changes shall, except in the case of emergencies endangering the safety of persons or property, be made in writing. Contractor shall promptly comply with any and all written changes. No such change shall be deemed to invalidate this Agreement. If any change ordered by SGRE causes an increase or decrease in the cost or time required for performance of the Work, an equitable adjustment shall, upon the request of either Party, be made in the purchase price or time of performance or both. Any

**SIEMENS**

claims of Contractor for such adjustments shall, except in the case of emergency changes as described herein, be asserted in writing within ten (10) calendar days after receipt of notice from SGRE of the proposed change, or shall, if not made prior to such time, be conclusively deemed to have been waived. Claims by Contractor for adjustments, changes, increases or deletions to the Work, terms and conditions, schedule, price or payment will not be allowed unless authorization shall have been duly granted in writing by SGRE prior to implementation.

## 9.  ASSIGNMENT AND STATUS

A)      The Contractor may not assign this Agreement nor any rights or obligations hereunder without SGRE's prior written consent.  Any purported assignment without such prior written consent shall be void.

B)      Contractor shall immediately notify SGRE of any change in its status including, but not limited to, bankruptcy, insolvency, change of ownership or control, strike or work stoppage.

C)      SGRE may, without consent, assign this Agreement or any Purchase Order issued hereunder, in whole or in part to any subsidiary, present or future Affiliate of SGRE or Siemens AG,  a customer of SGRE, or to any successor to the wind power generation business of SGRE.

## 10. INTELLECTUAL PROPERTY RIGHTS

A)      Contractor agrees to make prompt and complete disclosure to SGRE of all inventions and discoveries made or conceived as a result of Work performed under this Agreement.  Contractor agrees to keep necessary records including, but not limited to, notes, sketches, drawings, models and data supporting such inventions and discoveries and will furnish to SGRE upon request all such records.

B)      Any invention, discovery, proprietary information, software, system, data, drawings, design, specifications, artwork, photographs, manuals, programs or reports resulting from the Work performed under this Agreement shall be the sole property of SGRE.  All patents, copyrights, trade secrets, trademarks, data, drawings, designs, artwork, photographs, manuals, programs, software, specifications and all information including innovations contained therein delivered to SGRE or other intellectual property resulting from Work under this Agreement shall be the sole property of SGRE.  SGRE shall have the full right to use such property in any manner without any claim on the part of Contractor and without any duty to account to Contractor for such use.  Contractor agrees to assign for no additional consideration to SGRE any patent or patent application resulting from Work performed under this Agreement and to provide reasonable support for SGRE's prosecution of such patent application.

C)      Contractor and SGRE agree that any original work of authorship created under this Agreement is a work made for hire for purposes of copyright ownership for which SGRE may apply copyright or other form of intellectual property protection in its own name and may be used by SGRE for any purpose, whatsoever, irrespective of any statement to the contrary appearing on such data, drawing, artwork, photographs, manuals, programs, designs, software and specifications.  Unless otherwise approved by SGRE in writing, and without additional cost to SGRE, it is the sole responsibility of Contractor to obtain any and all licenses and rights necessary to afford SGRE the foregoing rights.  To whatever extent Contractor has any interest in any original work or authorship created under this Agreement, Contractor agrees to assign and hereby assigns its entire interest in such work to SGRE, including all rights to derivative works.

D)      Contractor agrees to grant SGRE permission to include Contractor's (including Contractor's suppliers and subcontractors of any tier) copyrighted, proprietary and other documents in manuals and instruction books for use by SGRE, its co-venturers and its customers.  These documents include, but are not limited to, drawings, sketches, specifications, operating instructions, installation instructions, maintenance and troubleshooting procedures, literature and marketing brochures furnished to SGRE by Contractor.

SIEMENS

E)      This Agreement does not confer or grant, in any manner whatsoever, any license or right under any patent, trademark, trade secret, copyright or other intellectual property right held by SGRE, unless specifically set forth in the body of this Agreement.

## 11.  INTELLECTUAL PROPERTY INDEMNIFICATION

A)      Contractor shall defend, indemnify and hold harmless SGRE, SGRE's customer and its officers, agents and employees from any and all liability, including costs and expenses, for infringement of any patent, copyright, trademark and other intellectual property right arising out of performance by Contractor under this Agreement or SGRE's or SGRE's customer's possession or use of the Work. SGRE shall inform Contractor as soon as practicable of any suit or claim alleging such infringement and shall give Contractor such opportunity, if afforded by applicable laws, rules or regulations, to participate in the defense thereof.

B)      In case the Work, or any part thereof, as a result of any suit or proceeding so defended is held to constitute infringement or its use by SGRE or SGRE's customer is enjoined, Contractor will, at its option and its own expense: (a) procure for SGRE the right to continue using said Work; (b) replace it with substantially equivalent noninfringing Work; or (c) modify it so it becomes non-infringing.

## 12.  PROTECTION OF INFORMATION

A)      All information marked or designated as confidential or proprietary including, but not limited to, software, data, drawings, designs, specifications, photographs, manuals, artwork and sketches relating to Work hereunder furnished by SGRE to Contractor or developed by Contractor for SGRE shall (except to the extent such information has been independently developed prior to this Agreement by Contractor or is received by Contractor from a third party without restriction) be treated by Contractor as SGRE's confidential proprietary information ("Information").

B)      Contractor agrees that it will use SGRE's Information only in connection with the Work ("Permitted Use"). Contractor shall not use such Information for any purpose except the Permitted Use. Contractor shall not transmit or further disclose such Information to any third party, including its parent, affiliates, subsidiaries or subcontractors without first obtaining prior written approval of SGRE. In the event that Contractor is required by a court or federal, state or local agency to disclose any Information, Contractor shall promptly notify SGRE of such order so that SGRE may seek a protective order or take action as it deems appropriate. In such circumstances, Contractor shall exercise reasonable efforts to disclose only the minimal amount of Information required to satisfy such order. All Information delivered pursuant to this Agreement shall be maintained in confidence with the same level of care as Contractor maintains its own confidential and proprietary information but in no event maintained with any less than a reasonable standard of care from the date of disclosure until ten (10) years after the expiration or termination of this Agreement.

C)      Contractor shall not make any copy or in any way reproduce or excerpt such Information except where necessary for the Work or as authorized by SGRE in writing.

D)      Contractor's duties of confidentiality under this Agreement shall not apply to Information which it can show is the same as information which is: 1) now generally known or readily available to the trade or public; or 2) possessed by Contractor or an Affiliate of Contractor and not subject to a confidentiality obligation prior to its disclosure hereunder; or 3) legally acquired from a third party without restriction; or 4) developed independently by Contractor without benefit of confidential and proprietary information furnished hereunder by SGRE.

## 13.  COMPLIANCE

A) Contractor agrees to comply with all applicable national, state, municipal and local laws as well as all rules, regulations, executive or other orders, codes, standards, permits, requirements and regulations thereunder, including, but not limited to, the Fair Labor Standards Act of 1938, as amended, the Occupational Safety and Health Act of 1970, as amended, the Toxic Substance Control Act (P.L. 94-469), as amended, ANSI, ASME, AIEE, ASTM and NEMA in effect at the time this Agreement is executed unless otherwise specified and any and all laws, rules, regulations, orders, directives or ordinances affecting, controlling, limiting, regulating, pertaining or related to emissions, discharges, hazardous, toxic, radioactive, substances, materials or wastes ("Governmental Requirements").

SIEMENS

B) Contractor shall comply with all applicable provisions of Executive Order 11246 of September 24, 1965, as amended, the terms of which are incorporated herein by this reference and made a part of this Agreement. Contractor is hereby notified that it is the policy of SGRE to provide equal employment opportunity and to adhere to federal, state and local laws pertaining thereto. Appropriate action shall be taken by Contractor with respect to itself and any of its subcontractors, vendors and suppliers to ensure compliance with such laws. All federal, state and local equal opportunity and affirmative action requirements with regard to race, gender, creed, color, age, religion, national origin, disability or veteran status are incorporated herein by reference.

C) Without limiting the generality of the foregoing, Contractor warrants that the Work, and any and all parts, components or material thereof, shall bear all markings, labels, warnings, notices or other information required under any applicable Governmental Requirements. Without limiting Contractor's obligations pursuant to the preceding of this Article 13:

> (i)    Contractor warrants that each and every chemical substance or material sold, transferred or delivered under this Agreement shall, at the time of sale, transfer or delivery, be on the list of chemical substances compiled and published by the Administrator of the United States Environmental Protection Agency pursuant to Section 8(B) of the Toxic Substances Control Act (Public Law 94-469). Contractor shall submit to SGRE with each item a list of the chemical substances which are contained in or on the Work deliverable hereunder, or as required by Governmental Requirements, Material Safety Data Sheets, prepared in accordance with Governmental Requirements (including without limitation the OSHA Hazardous Communication Standard 29 CFR 1910.1200, et seq.);

> (ii)    If any Work which is otherwise lawfully delivered hereunder is subject to restrictions, reporting or other information requirements under Governmental Requirements, Contractor shall comply with all such requirements and shall, as requested by SGRE, provide reports regarding such Work and documentation evidencing such compliance with all Governmental Requirements;

> (iii)    Contractor shall employ only such practices, materials and substances in its performance and delivery of Work, including substances and materials which are part of or contained in the Work delivered hereunder, which are lawful under Governmental Requirements; and

> (iv)    Contractor shall be responsible for all chemical substances or mixtures which it or its subcontractors or suppliers of any tier bring onto the premises of SGRE or its customer and for any excess, waste or residue (including without limitation containers of any of such chemicals not consumed in the performance of the Work) resulting from or generated in the performance of any Work (herein the "Environmental Materials"). Without limiting the generality of the foregoing, Contractor shall be responsible for lawfully removing and disposing of all such Environmental Materials, mixtures, containers and residue from their use, in accordance with all applicable federal, state and/or local statutes, laws, regulations, rules, orders and ordinances.

D) Contractor shall obtain all building permits and other permits or licenses, but not easements or other permanent interests in real property, which may be required in connection with the performance of the Work. Contractor shall also be responsible for obtaining any licenses, permits or approvals necessary to export any part of the Work from the United States. Contractor shall provide SGRE with all relevant U.S. export control product classification numbers and any related information requested by SGRE or SGRE's contract freight forwarder. Contractor shall be responsible for marking all products provided as part of the Work to indicate the applicable country of origin. Such marking shall be clear, conspicuous and permanent. If the product is not capable of being marked, the outermost box or container shall be marked with the country of origin.

E) Contractor shall give all notices, pay all fees and take all other action which may be necessary to ensure that the Work is performed in accordance with all applicable statutes, ordinances, rules and regulations including, without limitation, the above stated standards and acts, any statutes regarding qualification to do business and any statutes

SIEMENS

prohibiting discrimination among employees because of race, creed, color, national origin, age or sex or the employment of convict labor. Contractor shall promptly examine the Work requirements and Agreement documents and will report to SGRE any aspects in which it appears that such Work requirements fail to conform to any applicable statute, rule, regulation or ordinance. At or before the time of SGRE's final acceptance of the Work, Contractor shall deliver to SGRE all certificates, receipts or other evidence of approval, acceptance or payment of fees which may be required to establish the compliance of the Work with all applicable statutes, rules, regulations and ordinances.

F) Contractor represents and warrants that all equipment, material, components or parts furnished hereunder are free of asbestos and asbestos containing materials. The term "asbestos" shall include chrysotile, amosite, crocidolite, tremolite asbestos, anthophyllite asbestos, actinolite asbestos, and any of these minerals that has been chemically treated and/or altered.

G) Code of Conduct. Contractor agrees to the following provisions:

1) Contractor will comply with the principles and requirements of the "Code of Conduct for Siemens' Suppliers" attached hereto as **Exhibit F** (hereinafter the "Code of Conduct");

2) If requested by SGRE, Contractor will provide to SGRE (a) a written self-assessment in the form provided by SGRE, or (b) a written report approved by SGRE describing the actions taken or to be taken by Contractor to assure compliance with the Code of Conduct;

3) SGRE, at its discretion, shall be entitled to conduct inspections, at Contractor's premises, in order to verify Contractor's compliance with the Code of Conduct. Inspections may only be conducted by SGRE, including its authorized agents and representatives or other designated third parties, upon prior written notice to Contractor, during normal business hours. Such inspections shall be in accordance with the applicable data protection laws and shall neither unreasonably interfere with Contractor's business operations nor violate any of Contractor's confidentiality agreements with third parties. Contractor shall reasonably cooperate in any inspections conducted. Each Party shall bear its own expenses in connection with such inspection; and

4) In addition to any other rights and remedies SGRE may have, in the event of:

(i) Contractor's material or repeated failure to comply with the Code of Conduct; or

(ii)     Contractor's denial of SGRE's right of inspection as provided for in sub-paragraph 12G(3), after providing Contractor reasonable notice of such failure and a reasonable opportunity to cure said failure, then SGRE may terminate the Services Subcontract and/or Purchase Order without any liability whatsoever. Such termination shall be deemed a termination for default as provided in sub-paragraph 14(D). Material failures include, but are not limited to, incidents of child labor, corruption and bribery, and failure to comply with the Code of Conduct's environmental protection requirements. The notice and opportunity to cure said failure as provided in subparagraph 12G(4) shall not apply to violations of requirements and principles regarding the prohibition of child labor as set out in the Code of Conduct or willful failures to comply with the Code of Conduct's environmental protection requirements. If SGRE has any concerns, or suspects that any violation of the above provisions has taken place, Contractor shall cooperate to determine whether such a violation occurred and take all appropriate action to remedy or redress such a violation.

H) Contractor shall, if applicable, comply with United States Importer Security Filing (ISF) requirements, also known as 10+2, which requires Contractor to submit specific information for all its ocean shipments destined for US ports pursuant to US Customs Border Protection (CBP) regulations. If Contractor fails to provide complete and accurate

SIEMENS

information to the ISF filing agent identified by SGRE pursuant to US Customs Border Protection regulations, then such failure may result in delays, detention of the cargo or of the ocean vessel, or liquidated damages charged by US Customs Border Protection. Any liquidated damages, penalties, fines, detention costs or other costs or expenses incurred by SGRE as a result of Contractor's noncompliance with ISF Notification requirements will be charged back to Contractor.

I)   Contractor shall comply with the Customs-Trade Partnership Against Terrorism (C-TPAT) and the World Customs Organization's SAFE Framework of Standards for security requirements. Without limiting the generality of the preceding, Contractor must implement reasonable security control standards which address the following areas when delivering merchandise to SGRE in the United States:

> (i)    Procedural Security: Contractor will have procedures in place to protect against unauthorized material being introduced into the Work;

> (ii)   Physical & Access Security: Contractor's facilities will have adequate security measures installed to protect against unauthorized access and to resist unlawful entry to Contractor's facilities, including but not limited to adequate security measures to confirm the identity of Contractor's employees, visitors and vendors, and information technology security to prevent unauthorized access to Contractor's information technology systems;

> (iii)  Personnel Security: Contractor will conduct employment screening in accordance with the local laws of the location of Contractor's facilities or offices, including background checks and identity verification. Contractor will immediately dismiss from the Site any employee who engages in any act of violence or vandalism, and Contractor shall dismiss from the Site any employee who commits more than one (1) disciplinary offense;

> (iv)   Education and Training Awareness: Contractor will implement a security awareness training program which trains its employees on a) appropriate ways of securing Contractor's cargo; b) how to identify and address unauthorized access to Contractor's cargo; and c) communication protocols for notifying governmental agencies when illegal activities are present or suspected;

> (v)    Transportation Security: Contractor will implement reasonable steps to protect against the introduction of unauthorized personnel and material in any transport conveyance (e.g., containers, trucks, drums, etc.); and

> (vi)   Notification to SGRE: If Contractor suspects a security breach in Contractor's supply chain or such a breach is discovered or suspected after dispatch of the Work from Contractor's facility, Contractor must notify SGRE immediately.

## 14.  SUSPENSION OF WORK

SGRE may, at any time, by written order to Contractor, require Contractor to suspend all, or any part of, the Work called for by the Purchase Order. Upon receipt of the suspension order, Contractor shall immediately comply with its terms and take all reasonable steps to minimize any costs for Work related to the suspension order. SGRE may either (1) cancel the suspension order and in such event, Contractor shall resume Work; or (2) terminate the Work covered by the suspension order as provided in Article 15, Termination, of this Agreement. In the event SGRE cancels the suspension order and requests Contractor to resume the Work, SGRE will provide an equitable adjustment in the purchase price and completion date, and SGRE will modify the Purchase Order accordingly, in writing.

## 15.  TERMINATION

A)   SGRE may terminate this Agreement for its convenience, in whole or in part, at any time by written notice to Contractor. In such event, Contractor shall promptly comply with the directions contained in such notice and shall, subject to such direction: (1) take all necessary action to terminate the Work as provided in the notice, minimizing

**SIEMENS**

costs and liabilities; (2) protect, preserve and deliver any property related to this Agreement which is in Contractor's possession pursuant to SGRE's direction; and (3) continue the performance of such part of the Work, if any, as may not have been terminated by such notice.

B)    In the event of termination for the convenience of SGRE, if Contractor at the time of such termination shall have in stock or on firm order any completed or uncompleted items or any raw, semi-processed or completed materials for use in fulfilling this Agreement, then: (1) in the case of completed items or materials, SGRE may either require delivery of all or part of the completed items or materials and make payment therefor at the purchase price, or, without taking delivery thereof, pay Contractor the difference, if any, of the purchase price over the market price at the time of termination; and (2) in the case of uncompleted items or raw or semi-processed materials, SGRE shall, at its option, either require Contractor to deliver all or part of such items or materials at the portion of the purchase price representing their stage of completion, or, without taking delivery thereof, pay Contractor with respect to such items or materials as are properly allocable to this Agreement a portion of the purchase price representing the stage of completion of such items or materials, reduced by the higher of the market or scrap value of such items or materials at such stage of completion; and (3) in the case of items or materials which Contractor has on firm order, SGRE shall, at its option, either take an assignment of Contractor's right under such order or pay the costs, if any, of settling or discharging Contractor's obligation under such order.  In the event of termination for convenience, SGRE's total liability to Contractor for any termination pursuant to this Article 15 shall not exceed the purchase price of the Work to which such termination applies.  Further, Contractor shall have no claim against SGRE for loss of anticipated profits or consequential, special, indirect or incidental damages suffered by reason of such termination.

C)    SGRE shall have the right, by written notice to Contractor, to terminate the whole or any part of this Agreement for default: (1) if Contractor fails to complete such Work or to perform the Work within the time or in the manner provided under this Agreement; (2) if reasonable grounds for insecurity arise with respect to Contractor's performance and Contractor fails to furnish adequate assurances within ten (10) calendar days after a written demand by SGRE for such assurances; (3) if Contractor becomes insolvent or makes an assignment for the benefit of creditors, commits an act of bankruptcy or files or has filed against it a petition in bankruptcy or reorganization proceedings; (4) a change in ownership or control of Contractor which SGRE, in its sole discretion, deems unacceptable or (5) if Contractor breaches any of the provisions in Article 13(G).

D)    In the event SGRE terminates this Agreement, in whole or in part, for default, SGRE may procure, upon such terms as SGRE may deem appropriate, items, materials or work similar to those so terminated and Contractor shall be liable to SGRE for any excess costs for such similar items, materials or work.  In addition, SGRE may, at its option, require Contractor to deliver to SGRE any completed or partially completed items, materials or Work related to this Agreement by accounting for such action in accordance with sub-paragraphs (1) and (2) of Article 15(B) above for such delivered items, materials or Work, or by taking an assignment of Contractor's rights pursuant to subparagraph (3) of said Article 15(B).

E)    Should Contractor at any time (1) become insolvent, be adjudicated a bankrupt, make a general assignment for the benefit of creditors, make or permit the appointment of a receiver for all or substantially all its property or (2) fail or refuse to prosecute the Work diligently or (3) fail to perform any other requirement of this Agreement and not cure such failure within ten (10) calendar days after written notice thereof from SGRE, SGRE shall have the right, at its election and without prejudice to any other remedies, to take possession, for the purpose of completing the Work, of all materials, tools, equipment and appliances at the Work site, and either complete or employ any other person(s) to complete the Work.  In case of such termination of this Agreement, Contractor shall not be entitled to any further payment until the Work has been fully completed and accepted by SGRE at which time (a) if the unpaid balance of the Agreement price exceeds the expense (including, but not limited to, the cost of completing the Work) sustained by SGRE on account of Contractor's default, the amount of such excess shall be retained by SGRE without further obligation to Contractor, or (b) if such unpaid balance is less than the expense and consequential damage sustained by SGRE, Contractor shall pay the amount of such deficiency to SGRE.

SIEMENS

___

### 16. SUBCONTRACTING

A)      Contractor shall not subcontract any portion of the Work without the prior written approval of SGRE. Unless otherwise specified, this restriction shall not apply to purchases of raw materials, standard commercial items or services.

B)      Contractor, if required by SGRE, shall disclose, in writing, the extent of any subcontracting and/or purchased materials, equipment or services anticipated on this Agreement.

C)      Any notice provided by Contractor and any such consent by SGRE shall not relieve Contractor of full responsibility for the performance of the Work in accordance with all the requirements of this Agreement. Contractor shall, notwithstanding any approval by SGRE, remain as fully responsible for the acts and omissions of all subcontractors and materials suppliers including their respective agents and employees as it is for its own acts and those of its agents and employees.

### 17. WARRANTY

A)      Contractor warrants that any equipment or manufactured items delivered by Contractor under this Agreement shall be free from any defects or nonconformity in design, workmanship and materials; shall be of the kind and quality described in this Agreement, the specification, and/or the Purchase Order, and any other applicable documents; shall be fit for the purpose intended; shall perform in the manner specified and shall comply with all requirements of this Agreement, until the later of sixty (60) months after first placed into service by SGRE, or seventy-two (72) months after delivery. Contractor shall correct any nonconformity with this warranty at its sole expense, as directed by SGRE, by promptly accomplishing one or more of the following: (1) repairing or replacing the nonconforming Work (including correcting any plans, specifications or drawings affected); (2) furnishing SGRE any materials, parts and instructions necessary to correct or have corrected the nonconformity at Contractor's cost; or (3) paying SGRE a portion of the purchase price as is equitable under the circumstances.

B)      Contractor warrants that any technical field assistance or other Services furnished by it shall reflect the highest standards of professional knowledge and judgment; shall be free from defects in workmanship; and shall be in compliance with all requirements of this Agreement, until one (1) year from the acceptance by SGRE of all such Services. Contractor shall correct any nonconformity with the warranty at its sole expense, as directed by SGRE, by promptly: (1) correcting the nonconforming Work or Services; or (2) paying to SGRE a portion of the purchase price as is equitable under the circumstances.

C)      The warranty with respect to any corrected Work or Services provided for in Articles 17(A) and (B) above shall be subject to the same terms as the original warranty except that the warranty period on any such corrected Work or Services shall be one (1) year from the date of repair, replacement, or reperformance or until the end of the original warranty period, whichever is longer.

D)      The warranty herein expressed shall not be sole and exclusive and is intended to include additional warranties as provided for in the specifications or other requirements provided for in this Agreement.

E)      In the event of any breach or non-compliance by Contractor with this warranty obligation, without limiting any of its rights and remedies, SGRE shall also be entitled to recover any and all costs and expenses incurred by SGRE or payable to third parties, including but not limited to, additional costs of SGRE personnel (based on standard hourly rates) or other labor, evaluation costs, re-working or scrapping costs, additional or premium transportation or testing conducted by SGRE.

### 18. RESOLUTION OF CONFLICTS OR INCONSISTENCIES OCCURRING IN THIS AGREEMENT

Contractor shall clarify with SGRE any inconsistencies or conflicts in any part of this Agreement. Should Contractor fail to contact SGRE to resolve any such conflicts or inconsistencies, Contractor will be solely responsible for any errors resulting from any conflicts or inconsistencies. Where documents are referenced, the issue date in effect at the

SIEMENS

time of this Agreement or any written change per Article 8, Changes, shall be applicable, unless another issue date is specified.

## 19.  DISPUTE RESOLUTION

Any action or proceeding filed by Contractor against SGRE under this Agreement shall be filed exclusively in the state or federal courts in Orlando, Florida, which shall then have exclusive jurisdiction.

## 20.  TAXES

A)      The purchase price of SGRE to Contractor shall not include sales or use taxes imposed upon the sale or use of tangible personal property or services contemplated by this Agreement based upon sales and use tax laws pertaining to contractors in the jurisdiction in which the Work is performed.  Such taxes, if chargeable to SGRE in the jurisdiction where the Work is performed, are for SGRE's account and shall be separately stated and billed as such during invoicing.  If the contracted Work is for resale by SGRE, SGRE may furnish an exemption certificate to Contractor. All other taxes imposed on the Work are for the account of Contractor, including, but not limited to, property, inventory, excise, transportation, gross receipts, business privilege and occupational taxes imposed with respect to the Work, even when title has passed to SGRE pursuant to this Agreement but which may be levied while the Work is being stored by Contractor or is otherwise in Contractor's custody.

B)      It is understood that SGRE has no obligation under local, state or federal laws regarding Contractor or any employees, agents or subcontractors employed by Contractor and that the total commitment and liability of SGRE in regard to any arrangement or Work performed hereunder is to pay the fees and expenses pursuant to the provisions hereof.  All taxes applicable to any amounts paid by SGRE to Contractor under this Agreement will be Contractor's liability and SGRE shall not withhold, nor pay any amounts for federal, state or municipal income tax, self employment tax, social security, unemployment or worker's compensation.  Contractor hereby acknowledges personal income tax liability for the self-employment tax imposed by Section 1401 of the Internal Revenue Code and the payment, when applicable, of estimated quarterly Internal Revenue Service ("IRS") Forms 1040-ES:  Declaration of Estimated Tax by Individuals.  Upon request by SGRE, Contractor shall provide documentation evidencing compliance with all applicable federal, state and municipal income tax, self-employment tax, social security, unemployment, worker's compensation or other employment laws in regard to the Work performed under this Agreement.  All contractors are required to complete and return form W-9.  As required by law, backup withholding of thirty percent (30%) of each payment will be withheld from contractors who do not furnish a complete and accurate W-9.  SGRE shall annually file with the IRS a Form 1099 reflecting the gross annual payments by SGRE to Contractor as required by IRS Regulations.

C)      Contractor shall indemnify and save SGRE harmless from and against any liability for any such taxes, premiums and contributions which are now due or may become due, including penalties and interest, pursuant to this Agreement.  Should SGRE incur additional tax liabilities due to actions or business practices of Contractor pursuant to this Agreement, SGRE will bill Contractor for any additional cost plus twenty-five percent (25%) markup. Contractor shall immediately remit any amount so invoiced by SGRE or SGRE may withhold such amount from any outstanding payments then due to Contractor.

## 21.  INSURANCE AND INDEMNITY

A)      Prior to commencing Work on the premises owned, controlled or used by SGRE or on the site designated by SGRE, Contractor shall provide safety protection for personnel in accordance with applicable laws, regulations and site procedures.  In the event Contractor fails to provide such protection, SGRE may order Contractor to cease Work until such protection is provided.  If Contractor is unable or refuses to take corrective action to provide such protection, SGRE may contract for or otherwise accomplish a continuation of the Work and backcharge Contractor the excess cost incurred by SGRE thereby.

B)      Contractor shall indemnify, defend and save harmless SGRE, its subsidiaries, Affiliates, customers and any other SGRE designated third party from and against any and all losses, liabilities, claims, liens, demands and causes of action of every kind and character whatsoever (including without limitation, all costs, expenses and attorney's fees),

**SIEMENS**

arising out of any personal injury (including death) or any damage to or loss or destruction of property, any breach of this Agreement, any noncompliance with applicable laws, rules, regulations, ordinances, codes, or standards in any manner based upon, occasioned by, or attributable to this Agreement or any work performed or required to be performed hereunder whether by the Contractor, its subcontractor, any employee of the Contractor or its subcontractor, except where such injury to or death of persons or damage to or loss or destruction of property is due solely to the extent of the negligence of SGRE, its officers, agents or employees. The foregoing indemnity shall not apply to loss, damage or loss of use of any property, or injury or death of persons arising out of or resulting from a nuclear incident as defined in the Atomic Energy Act of 1954 as amended.

C)      Contractor shall maintain in effect, and require its subcontractors to maintain in effect during performance of any Work, insurance of the types and with the minimum limits as follows:

> (1)      Worker's Compensation and Employer's Liability Insurance. Worker's Compensation Insurance shall be in accordance with the statutory requirements of the state in which the Work is performed. Employer's Liability Insurance shall have a minimum limit of $1,000,000 each occurrence. If applicable, Longshoremen's and Harbor Worker's Coverage in accordance with statutory requirements of the state in which the Work is performed shall be included;

> (2)      Commercial General Liability Insurance, including coverage for premises, products/completed operations, broad form property damage (deleting the policy's care, custody and control exclusion) and contractual liability with a minimum limit of $5,000,000 each occurrence. If Work includes excavating, blasting, tunneling, etc., Explosion, Collapse and Undermining Coverage shall be included;

> (3)      Comprehensive Automobile Liability Insurance including coverage for owned, hired and non-owned automobiles with minimum limits of $5,000,000 each occurrence;

> (4)      If Contractor's Work includes the performance of any heavy-haul transportation services or other transportation services as part of the Work, Contractor agrees in advance of performing the Work to either i) provide cargo liability insurance to cover physical damage to property during the performance of the Work with minimum limits of $1,000,000 USD each occurrence; or ii) obtain additional coverage for the same on a case by case basis as requested by SGRE or as stipulated on the Purchase Order;

> (5)      If Contractor's Work includes any engineering services as part of the Work (to include any lift or transportation utilizing a lift plan or method statement prepared by a professional engineer), Contractor shall maintain Professional Liability insurance with limits of $5,000,000 USD each claim, which coverage shall (1) have a retroactive date no later than the date the Purchase Order was issued by SGRE and (2) shall be maintained until two (2) years after the completion of Seller's work under the Purchase Order; and

> (6)      The following coverages are required if the Work involves such exposures: (a) Environmental Impairment (including asbestos), and an MCS-90 Endorsement on Contractor's Auto Liability policy with coverage limits meeting the requirements of applicable law, and (b) Property Insurance covering all property under the care, custody and control of Contractor on a 100 percent replacement cost basis. These insurance requirements may be satisfied by any combination of excess and primary insurance coverage.

D)      Contractor agrees to cause the above insurance policies described herein to provide that it is primary to any insurance carried by SGRE. SGRE, its Affiliates, subsidiaries, directors, officers and employees, SGRE's customer and/or any other party designated by SGRE shall be named as an additional insured under all coverages herein, including umbrella liability coverages, except Workers Compensation, Professional Liability, and Employer's Liability. Contractor and its insurers agree to waive all rights of subrogation against SGRE, its Affiliates, subsidiaries, directors, officers, agents and employees, SGRE's customer and any other party designated as an additional insured under all coverages herein.

SIEMENS

E)      Before commencing the Work, Contractor shall furnish certificates of insurance evidencing such coverages in a form satisfactory to SGRE and shall maintain such insurance in full force and effect until this Agreement has been fully performed and the Work accepted in writing by SGRE and/or all equipment, implements and machinery of Contractor have been removed from and all employees, agents, representatives and sub agencies, subcontractors and/or suppliers of Contractor have left the site. Certificates of insurance shall stipulate that the insurance policies will not be canceled nor any change made in the policies and/or coverage(s) without thirty (30) calendar days prior written notice beginning upon the day of receipt of registered mail concerning same by SGRE. Failure of SGRE to request certificates of insurance does not constitute a waiver of the terms of this requirement

F)      SGRE reserves the right at any time during performance of Work by Contractor to require Contractor to provide insurance in types and amounts in a form different and/or greater than that stated herein with respect to unique circumstances (work related or otherwise) and as may otherwise be required by customers of SGRE or required by governmental entities. Neither the procurement, maintenance or acceptance of insurance coverage by SGRE shall relieve Contractor of liability for loss or damage in excess of the policy coverage or limits specified herein.

## 22.  SGRE FURNISHED PROPERTY
The following additional provisions shall apply to any and all tools, patterns, equipment, material or other property which is supplied to Contractor by SGRE or purchased by or on behalf of SGRE to perform the Work (hereinafter "SGRE Furnished Property"):

A)      SGRE Furnished Property provided to Contractor is furnished "AS IS", "WHERE IS", and "WITH ALL FAULTS", with no warranties or guarantees whatsoever, whether as to adequacy of form, fit or function, with respect to any intended use or fitness for any purpose by Contractor, or that such SGRE Furnished Property may be used by Contractor in conjunction with any other material and/or property of either Contractor or SGRE, or otherwise. Contractor shall not use SGRE Furnished Property on any other work without the prior written consent of SGRE.

B)      Title and all rights to SGRE Furnished Property shall remain with SGRE at all times. Contractor shall segregate and clearly mark SGRE Furnished Property to show SGRE's ownership and shall do all things necessary to preserve SGRE's title thereto, free and clear of all encumbrances. Contractor shall, if requested by SGRE, submit to SGRE an itemized inventory showing the description, location and identifying marks of each item of SGRE Furnished Property. SGRE shall have the right to enter Contractor's premises at any time and inspect any and all SGRE Furnished Property. Should Contractor fail to perform the duties imposed upon it by this Article 22(B) or should SGRE at any time have reason to believe that its title to, or right to the possession of any SGRE Furnished Property is threatened, SGRE shall have the right to enter Contractor's premises and remove any or all such property. Upon completion or termination of this Agreement, Contractor shall segregate and collect in one location all SGRE Furnished Property and shall dispose of the same as SGRE may direct. SGRE reserves the right to abandon SGRE Furnished Property at no additional cost to SGRE upon issuance of written notification to Contractor of such intent. Upon termination, including expiration of term or completion of Work, Contractor shall immediately surrender and return to SGRE all information, equipment, furnishings, supplies or other property of SGRE in the same good order and condition as when received by Contractor with reasonable wear and tear excepted.

C)      Contractor shall, at its own expense, perform all maintenance, repairs and replacements necessary with respect to SGRE Furnished Property so that the same may remain suitable for the use contemplated hereby and may, at the time required by this Agreement, be returned to SGRE in as good condition as when received, except for reasonable wear and tear or consumption of materials necessarily resulting from their use.

D)      Contractor shall give SGRE prompt written notice of any SGRE Furnished Property which upon delivery to Contractor is found to be defective. The correction or replacement of such defective property shall be accomplished at SGRE's written direction.

E)      Upon delivery to, procurement by or manufacture by Contractor of any SGRE Furnished Property, the risk of loss or damage thereto shall be upon Contractor. Risk of loss or damage shall transfer to SGRE when such property is returned to SGRE in the manner required hereunder.

SIEMENS

F)      Contractor shall indemnify SGRE against any and all liability for damage to property or injury to or death of persons arising from or incidental to the presence or use of SGRE Furnished Property, whether such damage, injury or death is caused by defects in such property, Contractor's negligence in the use thereof, strict liability or otherwise.

## 23.  NONEXCLUSIVE REMEDIES
Except as otherwise expressly provided herein, the rights and remedies of SGRE provided herein shall not be exclusive and are in addition to any other rights and remedies provided by statute, at law or in equity.

## 24.  SITE CONDITIONS
A)      SGRE shall provide, at no charge to Contractor, reasonable amounts of water, electricity or other facilities currently available at the site where the Work is to be performed.  Contractor shall make whatever arrangements are necessary and pay all costs for additional water, electricity or other facilities needed for the Work, including but not limited to temporary utility lines.  Contractor, at its own expense, shall remove same at the completion of Work unless otherwise approved by SGRE.

B)      Contractor, by execution of this Agreement, represents that it has visited or has had full opportunity to examine the site upon which the Work is to be completed; that it has satisfied itself as to the requirements of the Work and all conditions which may affect the Work; and that its entry into this Agreement has not been induced either wholly or in part by any promises, representations or statements on behalf of SGRE.  Contractor further represents that the price set forth in the Agreement has been determined with due regard to all such conditions and requirements affecting the Work, as well as the difficulties and delays incident to work of the nature contemplated hereby and agrees that no claim for any increase in such price shall be made except as specifically provided in this Agreement.

C)      Contractor shall provide all permanent and temporary shoring, anchoring and bracing required by the nature of the Work in order to make all parts absolutely stable and rigid, even when such shoring, anchoring, and bracing are not explicitly specified.  Contractor will be held strictly accountable for any damage to persons, properties or the premises resulting from failure to provide same, either through lack of proper judgment or for any other cause.

D)      Contractor shall, at its own expense, support and protect all buildings, bridges, roadways, conduit, wires, water pipes, gas pipes, sewers, pavements, curbing, sidewalks and fixtures of all kinds and all other public or private property that may be encountered or endangered in the performance of the Work herein contemplated.  Contractor shall repair any damage caused to any such property by reason of the Work.

E)      Contractor shall keep the site clean at all times and shall remove all rubbish at such times as may be determined by SGRE.  If Contractor fails to keep the site clean or to remove any rubbish within any reasonable time determined by SGRE, SGRE shall have the right to perform such cleaning as may be necessary or to have it performed, and to withhold or recover the cost thereof from Contractor.  Upon completion of the Work, Contractor shall leave the site in a clean, neat and orderly condition.

F)      SGRE shall have the right to perform or have performed, in and about the site during the time when Contractor is performing the Work required by this Agreement, such other work as SGRE may desire.  Contractor shall perform its Work hereunder in such manner as to enable both the Work under this Agreement and such other work to be completed without hindrance or interference from each other.  Any claim of Contractor arising out of any alleged interference due to the conduct of such other work shall be made to SGRE in writing within five (5) calendar days of the occurrence of the alleged interference and shall be deemed to have been waived unless so made.

G)      Contractor shall provide the following assurances to SGRE for any Contractor personnel having or requesting unescorted/uncontrolled access to SGRE locations or SGRE designated locations:  (1) pre-employment screening, including but not limited to, reference checks, validation of education, prior employment, citizenship, driver's license/motor vehicle records, criminal checks, fingerprinting; (2) drug/alcohol testing in the prevention, deterrence or rehabilitation of chemical dependency along with the management of its consequences; and (3) security awareness or other site-specific training, identification verification screening, criminal background checks, drug and alcohol

**SIEMENS**

screening prior to site access to a SGRE site or any SGRE's customer site or any other test, verification or training that may be required for access the site. If requested by SGRE, Contractor shall provide written assurance to SGRE, with documentation, that Contractor's personnel have been checked/tested and any concerns or improprieties about an individual have been brought to the attention of SGRE. Contractor shall remove and replace, at its sole expense, any of its personnel whom SGRE determines to be unfit, unsafe or otherwise unsuitable for work.

H)     Contractor shall provide, prior to its commencement of any Work on a site: (1) a health and safety plan regarding the conduct of its operations at the Work site fully acceptable to SGRE; and (2) an identification of any and all hazardous or toxic chemicals, substances or materials which it intends to bring to the Work site, the quantities thereof, any and all Material Safety Data Sheets therefor, and Contractor's plan to dispose of any hazardous waste generated therefrom or otherwise in the performance of the Work. No such substances, chemicals or materials shall be brought to the Work site unless specifically agreed upon in writing by SGRE. In any event, Contractor shall remain fully responsible for and shall indemnify and hold harmless SGRE against, any loss, damage, liability, cost, expenses, claims, or demands arising out of, resulting from or in any way connected with such chemicals, substances or materials or any wastes generated therefrom.

I)     Contractor shall immediately notify SGRE of any acts, omissions, conditions or events that may endanger the safe and healthy workplace along with Contractor's proposed remedy.

J)     Contractor travels at its own risk in performing any and all Work under this Agreement and/or a Purchase Order regardless of whether or not SGRE provides any services. The Parties agree that SGRE has no responsibility in any way for safety or security to Contractor or its Representatives.

## 25. EXAMINATION OF BOOKS AND RECORDS
SGRE shall have access to and audit rights to examine any directly pertinent books, documents, papers and records of Contractor involving transactions related to this Agreement until the expiration of three (3) years after final payment hereunder.

## 26. NEWS, PUBLICITY OR ADVERTISING RELEASES
No news release or any other publicity in any way relating to SGRE or Contractor concerning this Agreement shall be made by Contractor to any news media or the general public without the prior written approval of SGRE.

## 27. GOVERNING LAW
The performance and interpretation of this Agreement shall be governed by the laws of the State of Florida, USA, except its rules in regard to conflict of laws.

## FOR WORK TO BE PROVIDED FOR THE UNITED STATES FEDERAL GOVERNMENT, THE FOLLOWING ARTICLES SHALL ALSO APPLY:

## 28. GOVERNMENT ORDERS
When the Work furnished is to be used in the performance of a contract or subcontract with a governmental body or other entity requiring compliance with similar laws and regulations, Article 14 and the additional and supplementary terms and conditions herein shall apply.

## 29. CONGRESSIONAL ACT COMPLIANCE
A)     This Agreement shall be subject to any act of Congress, including, without limitation, the Renegotiation Act of 1951, whether heretofore or hereafter enacted and to the extent indicated therein, providing for the renegotiation of such Agreement and shall be deemed to contain all the provisions required by any such act without subsequent amendment hereof specifically incorporating such provisions.

SIEMENS

B)    Contractor agrees to insert the provisions of this clause, including this paragraph B), in subcontract(s) as defined in Section 103(g) of the Renegotiation Act of 1951 (P.L. 9, 82d Congress), except any subcontracts of a class or type described in Section 106(a) of the Renegotiation Act of 1951.

C)    Nothing contained in this Article 29 shall impose any renegotiation obligation with respect to this Agreement or any subcontract which is not imposed by an Act of Congress heretofore or hereafter enacted.

## 30. MILITARY SECURITY REQUIREMENTS

A)    Contractor shall be responsible for safeguarding all security information in accordance with the provisions of its security agreement with the Department of Defense and with all applicable Government requirements.

B)    Contractor shall insert, in all subcontracts hereunder which involve access to security information, provisions which shall conform substantially to the language of Article 30(A) above and of this Article 30(B).

## 31. EXAMINATION OF RECORDS

Contractor agrees that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of three (3) years after final payment under this Agreement, have access to and the right to examine any directly pertinent books, documents, papers and records of Contractor involving transactions related to this Agreement.

## 32. NOTICE OF LABOR DISPUTES

A)    Whenever Contractor has knowledge that any actual or potential labor dispute is delaying or threatens to delay the timely performance of this Agreement, Contractor shall immediately give notice thereof, including all relevant information with respect thereto, to SGRE.

B)    Contractor agrees to insert this entire Article 32 in any subcontract hereunder in the event a labor dispute may delay the timely performance of this Agreement; except that each such subcontract shall provide that in the event its timely performance is delayed or threatened by delay of any actual or potential labor dispute, the subcontractor shall immediately notify its next higher tier subcontractor or Contractor of all relevant information with respect to such dispute.

## 33. NONDISCRIMINATION IN EMPLOYMENT

Contractor shall comply with all applicable provisions of Executive Agreement 11246 of September 24, 1965, as amended, the terms of which are incorporated herein by this reference and made a part thereof. It is the policy of SGRE to provide equal employment opportunity and to adhere to federal, state and local laws pertaining thereto. Contractor will include this Article 33 in every lower-tier subcontract or purchase order, so that such provisions will be binding upon each subcontractor or vendor. Contractor shall take such action with respect to any such subcontract or purchase order as the contracting agency may direct as a means of enforcing such provisions, including sanctions for noncompliance; provided, however, that in the event Contractor becomes involved in, or is threatened with, litigation with a lower-tier subcontractor or vendor as a result of such direction by the contracting agency, Contractor may request the United States to enter into such litigation to protect the interests of the United States.

## 34. WORK HOURS ACT OF 1962

To the extent that the Work Hours Act of 1962 is applicable to this Agreement, the wages of every laborer and mechanic employed, either by Contractor or by any of its lower-tier subcontractors, in the performance of the Work required by this Agreement shall be computed and paid in accordance with the requirements of such Act. Contractor shall indemnify and save SGRE harmless from and against all liability and loss whatsoever on account of any violation of the foregoing.

## 35. WALSH-HEALY PUBLIC CONTRACTS ACT

If this Agreement is subject to the Walsh-Healy Public Contracts Act as amended (41 U.S. Code 35-45), this Act is hereby incorporated by reference and all representations and stipulations required by said Act and regulations issued

**SIEMENS**

thereunder by the Secretary of Labor will apply. Such representations and stipulations are subject to all applicable rulings and interpretations of the Secretary of Labor which are now or may hereafter be in effect.

**36. DAVIS-BACON ACT (40 U.S.C. 276a-276-a-7)**

A)  This Article 36 shall be effective only if this Agreement is subject to the Davis-Bacon Act.

B)  All mechanics and laborers employed or working directly upon the site of the Work will be paid unconditionally and not less often than once a week and without subsequent deduction or rebate on any account (except such payroll deductions as are permitted by the Copeland Act ["Anti-Kickback"] Regulations, 29 CFR Part 3) the full amounts due at the time of payment, computed at wage rates not less than those contained in the applicable wage determination decision of the Secretary of Labor, regardless of any contractual relationship which may be alleged to exist between Contractor or any of its subcontractors and such laborers and mechanics; a copy of any applicable wage determination decision shall be kept posted by Contractor at the site of the Work in a prominent place where it can be easily seen by the workers.

C)  In the event it is found by the Contracting Officers responsible for the Prime Contract that any laborer or mechanic employed by Contractor or any of its subcontractors directly on the site of the Work covered by this Agreement has been or is being paid at a rate of wages less than the rate of wages required by paragraph B) of this Article 36, SGRE shall have the right, if so directed by the Contracting Officer or if the Prime Contract is terminated in whole or in part for such reason, to terminate Contractor's right to proceed with the Work or such part of the Work as to which there has been a failure to pay such required wages and prosecute the Work to completion by contract or otherwise, whereupon Contractor and its sureties, if any, shall be liable to SGRE and the Government for any excess costs occasioned thereby.

**37. COPELAND ("ANTI-KICKBACK") ACT**

The regulations of the Secretary of Labor applicable to subcontractors (29 CFR, Part 3), made pursuant to the Copeland Act, as amended (40 U.S.C. 276c) and to aid in the enforcement of the Anti-Kickback Act (18 U.S.C. 874) are made a part of this Agreement by reference. Contractor will comply with these regulations and any amendments or modifications thereof and will submit to SGRE such affidavits as may be required of subcontracts thereunder. The foregoing shall apply except as the Secretary of Labor may specifically provide for reasonable limitations, variations, tolerances and exemptions.

**38. PATENT INDEMNITY**

To the extent that the Work under this Agreement is to be performed in substantial accordance with Contractor's specifications or drawings, Contractor shall indemnify SGRE, the Government and their respective officers, agents and employees against liability, including costs, for infringement of any United States letters patent (except those issued on an application which is now or may hereafter be kept secret or otherwise withheld from issue by order of the Government) arising out of the performance of the Work under this Agreement. The foregoing indemnity shall not apply unless Contractor shall have been informed as soon as practicable by SGRE or the Government of the suit or action alleging such infringement and shall have been given such opportunity as is afforded by applicable laws, rules or regulations to participate in the defense thereof, and, further, such indemnity shall not apply if: (1) the infringement results from compliance with specific written instructions of SGRE directing a manner or performance not normally used by Contractor; (2) the infringement results from an addition to, or change in, the Work made subsequent to performance by Contractor; or (3) the claimed infringement is settled without the consent of Contractor and in the absence of a final decree of a court of competent jurisdiction.

**39. FEDERAL ACQUISITION REGULATION**

The following clauses set forth in the Federal Acquisition Regulation, as in effect on the date of this Agreement, are, without limiting the generality of any other provision hereof, specifically incorporated by reference herein: Buy American Act (52.225); Convict Labor (52.222-3); Officials Not to Benefit (40 USC 327 et seq.); Utilization of Small,

SIEMENS

Small Disadvantaged and Women-Owned Small Business Concerns (52.219-8); Clean Air and Water (52.223-2); Priorities, Allocations and Allotments; Notice and Assistance Regarding Patent Infringement (52.227-2); and Filing of Patent Applications (52.227-10).  Where necessary to make the above clauses applicable to this Agreement, the term "Contracting Officer" shall be deemed to refer to SGRE and the term "Contract" shall be deemed to refer to this Agreement.

# SIEMENS

**IN WITNESS WHEREOF,** SGRE and Contractor have caused this Agreement to be signed and delivered by their duly authorized representatives.

Proactive Safety System LLC

By: _David B. Barnard_

Title: _President_

Name: _David B. Barnard_

Date: _July 23, 2018_

SIEMENS GAMESA RENEWABLE ENERGY, INC.

By: _____

Title: _JUL 26 2018_

Name: _Siemens Gamesa_

Date: _____

SIEMENS

List of Exhibits

**Exhibit A** General Statement of Services

**Exhibit B** Price Schedule

**Exhibit C** Reports and Format

**Exhibit D** Training Course Requirements **Exhibit**

**E** Electronic Messages

**Exhibit F** Code of Conduct for Suppliers

**Exhibit G** SGRE Data Security Requirements

**Exhibit A**

SIEMENS

## General Statement of Services

**Stock Keeper**

Stock Keepers receive or return site parts, carry out work within the storage area, and transport parts to hardstands:

- Receive, return or forward tools including "handshake" with delivering or receiving party.
- Complete documentation in connection with reception, forwarding and return of parts or if parts are missing.
- Collect and control tools for calibration.
- Inventory status of tools and parts.
- Mentor and share knowledge within area of responsibility.
- Support on-the-job training as requested.
- Keep records, maintain documentation and report as required by company policy.
- Maintain and follow safety procedures as required by company policy

**Technical Field Advisor (TFA)**

Technical field advisors advise customer contractor in preparation of site: Pre-energizing the working area (light, lift, cabinets etc.), foundation/monopile, offloading on ground, handling parts on ground.

- Advise in preassembly and erection of turbine components: Power unit, tower sections, nacelle, build rotor, single blade lift, cleaning, prepare and load vessel. Advise in safely and technical correct use of blade yolk.
- Advise in mechanical completion: Final installation of tower internals/externals, nacelle, hub and blades after erection, installation of additional options.
- Advise in cabling and electrical completion: Installation / pulling of cables, loop and routing, splicing of cables, termination of cables / wires including test of joints and termination.
- Specialist in work instructions, manuals, documentation and checklists.
- Reporting (check lists and workorders) and general cleaning of working area.
- Maintain and follow safety procedures as required by company policy

**Blade Repair Technician**

Blade repair technicians will assess and perform repairs to blades as required and within their skill sets. They will also perform nacelle and tower paint repairs as needed.

- Assess blade damages from 'Blade fault catalog onsite' (ZCI 1019466) and contact OM if the blade fault exceed own skills and training.
- Perform minor paint and finish repairs in the coating (A) e.g. rust on blades.
- Perform surface and finish repairs with damage in the coat or laminate (B) (e.g. minor lightning damages, but maximum in three layers depths).

SIEMENS

- Perform surface and finish repairs with damage in the structure (C) e.g. repairs in inner laminate or outer laminate to balsa layer.

- Reporting (NCR, damage reports, check lists and work orders) and general cleaning of working area.

**EHS Coordinator**

Manage site team to enforce site specific EHS plans and implement emergency response plans as needed for wind farm projects throughout the Americas.

- conduct daily safety meetings and direct crews in EHS concerns
- Perform Job Hazard Analysis/Risk Assessments on determine high-risk factors and mitigation tactics; Assess compliance of EHS Personnel and implementation of EHS Program through Siemens EHS audits; Submit daily and weekly site inspection reports
- Assist with OSHA compliance and develop methods to improve site safety and culture.
- Ensure wind projects meet all Federal, State, and local safety standards
- Verify that appropriate LOTO procedures are being performed to ensure worker safety.
- Support ISO 14001 and OHSAS 18001 audits by implementing corrective actions
- Manage site hazardous waste handling process, logging, collection and disposal

SIEMENS

## Exhibit B

### Price Schedule

| Professional Category | All-Inclusive Rate Per Hour |
|---|---|
| TFA Technician | $86.00 |
| Commissioning Support Technician | N/A |
| Materials Stock Keeper | N/A |
| Blade/Paint Repair Technician | $86.00 |
| EHS Coordinator | $85.00 |

For work outside of the continental United States, SGRE and Vendor will agree on adjustment hourly rates prior to mobilization to site. All chemicals for composite repair furnished by SGRE, otherwise HSE Safety Partners will be owed cost plus 10%. Any special tooling for composite work furnished by SGRE. HSE Safety Partners offers 2% discount on invoices payment made at 45 days.

**Siemens shall pay Contractor for each hour of productive work. Siemens shall not compensate Contractor for a minimum amount of hours of Work under this Agreement.**

**Siemens shall pay Contractor for a total amount of eight (8) hours of work for mobilization at the start of the Services and eight (8) hours for demobilization at the conclusion of the Services. Otherwise, daily travel by Technicians shall not be compensated by Siemens.**

**Above Pricing Includes the following provided by the contractor:**

- Vehicle (truck) at Site
- Cell Phone
- Basic Hand Tools
- PPE Climbing (Fully inspected and with current certifications)
  - Climb Gear, Harness
  - 2 Meter Lanyard
  - Lanyard Parking Loop
  - Lanyard, Retaining, 1 meter
  - Safety, Climb Gear, GlideLoc
  - Safety, Climb Gear, Trauma Strap
  - Twin Lanyard 6FT ANSI/CSA
  - Tool Lanyard,SQUIDS 3108 Self Double Locking Single Carbiner
- PPE Other
  - fire retardant clothing
  - steel toe / composite work boots
  - hardhat
  - gloves
  - safety glasses
  - reflective safety vest

SIEMENS

---

### Siemens Electronic Invoice Initiative

The submission of electronic invoices can be entered via the Siemens Invoices On-Line (IOL) website at www.SiemensAP.com.

Contractor may also directly send electronic file transfers from Contractor's billing system into the Siemens Accounts Payable system, via EDI 810 or XML industry standard invoice file formats.

Contractor is **required** to be set up with one of the above electronic methods. Moving to a paperless process will help reduce expenses and improve the processing and payment process.

SIEMENS

---

## Exhibit C

## Reports and Format

**Weekly Timesheet Reports**

Contractor shall submit timesheets to Siemens by the end of Contractor's last shift for the hours of Work performed by Contractor for the week. Each timesheet shall provide for a half hour lunch break on any day of 8 hours or more. All timesheets shall be signed by Siemens' Site representative.


Siemens shall submit a weekly report to Contractor of the hours of Work performed by the technicians for the week. Contractor should compare to its records and notify Siemens of any discrepancies prior to submitting an invoice online for payment. Only once discrepancies have been cleared by the Parties can Contractor submit an invoice online for payment. Invoices must include the approved by Siemens report as documentation. Payment shall be made for Work actually performed as accounted for in each timesheet and approved by Siemens.

SIEMENS

---

## Exhibit D
## Training Course Requirements

Technicians shall be certified as trained in safety & technical classes at all times during the provision of Services, and such certification must be current at the time Services are performed.

SIEMENS

# Exhibit E

## Electronic Messages

In order to optimize business processes and make more rapid and efficient exchanges of information, the Parties may mutually agree on using Electronic Messages as the format for valid Purchase Orders.

**Scope**

(i)        The Parties agree that Electronic Messages shall create valid and enforceable rights and obligations pursuant to the Agreement.

(ii)       Electronic Messages shall be considered (a) a tangible Purchase Order, Purchase Order Response, and/or related communication, (b) "executed" by an authorized representative of the applicable Party, and (c) admissible in evidence to the same extent as any hard-copy documentation.

(iii)      The provisions of the Agreement and this **Exhibit E** shall apply to the use of Electronic Messages between the Parties, regardless of whether the Electronic Message references the Agreement or this **Exhibit E**.

(iv)      The Parties agree that Electronic Messages shall be the primary form of communication, and other methods will only be used in the following circumstances:

a. Non-operability of systems necessary for transmitting and receiving Electronic Messages

b. Necessary to communicate content not supported by the Electronic Message format

**Implementation & Operation**

Each Party shall bear its own costs to provide and maintain its equipment, software, security procedures and facilities needed to transmit and receive Electronic Messages.

(i)        In the event the ability to exchange Electronic Messages is impaired, or expected to become impaired, the affected Party will provide sufficient and timely notice to the other Party.

(ii)       Both Parties shall take all reasonable measures to mitigate damages resulting from failures related to equipment, software, security procedures and facilities.

**Contractors**

(i) Either Party may transmit Electronic Messages directly or through a third party supplier.  Each Party shall remain contractually responsible for their obligations incurred under the Agreement.

SIEMENS

---

**Exhibit F**

SIEMENS

**Code of Conduct for Siemens Suppliers**

This Code of Conduct defines the basic requirements placed on Siemens' suppliers of goods and services concerning their responsibilities towards their stakeholders and the environment. Siemens reserves the right to reasonably change the requirements of this Code of Conduct due to changes of the Siemens Compliance Program. In such event Siemens expects the supplier to accept such reasonable changes.

**The supplier declares herewith:**

- **Legal compliance**
  - to comply with the laws of the applicable legal system(s).

- **Prohibition of corruption and bribery**
  - to tolerate no form of and not to engage in any form of corruption or bribery, including any payment or other form of benefit conferred on any government official for the purpose of influencing decision making in violation of law.

- **Respect for the basic human rights of employees**
  - to promote equal opportunities for and treatment of its employees irrespective of skin color, race, nationality, social background, disabilities, sexual orientation, political or religious conviction, sex or age; o   to respect the personal dignity, privacy and rights of each individual; o          to refuse to employ or make anyone work against his will;
  - to refuse to tolerate any unacceptable treatment of employees, such as mental cruelty, sexual harassment or discrimination;
  - to prohibit behavior including gestures, language and physical contact, that is sexual, coercive, threatening, abusive or exploitative; o   to provide fair remuneration and to guarantee the applicable national statutory minimum wage; o   to comply with the maximum number of working hours laid down in the applicable laws;
  - to recognize, as far as legally possible, the right of free association of employees and to neither favor nor discriminate against members of employee organizations or trade unions.

- **Prohibition of child labor**
  - to employ no workers under the age of 15 or, in those countries subject to the developing country exception of the ILO Convention 138, to employ no workers under the age of 14.

SIEMENS

- **Health and safety of employees**
  - o  to take responsibility for the health and safety of its employees;
  - o  to control hazards and take the best reasonably possible precautionary measures against accidents and occupational diseases; o  to provide training and ensure that employees are educated in health and safety issues; o  to set up or use a reasonable occupational health & safety management system.

- **Environmental protection**
  - o  to act in accordance with the applicable statutory and international standards regarding environmental protection;
  - o  to minimize environmental pollution and make continuous improvements in environmental protection; o  to set up or use a reasonable environmental management system.

- **Supply chain**
  - o  to use reasonable efforts to promote among its suppliers compliance with this Code of Conduct;
  - o  to comply with the principles of non discrimination with regard to supplier selection and treatment.

For further information see www.siemens.com/procurement/cr/code-of-conduct

**SIEMENS**

Code of Conduct for Siemens Suppliers V2.1, July 31, 2008

# Exhibit G

## Data Security Requirements

Contractor shall implement and maintain a written data security program that contains administrative, technical, and physical safeguards to protect Personal Information (as defined below) from loss, misuse, unauthorized access, disclosure, alteration or destruction. In the event of a Data Breach, Contractor shall notify Siemens in accordance with these Data Security Requirements ("**Requirements**") and comply with U.S. federal, state and local laws applicable to Contractor and the Personal Information.

1. Definitions

"**Computer Security System**" means, at a minimum, and to the extent technically feasible: (i) secure user authentication protocols including (a) control of user IDs and other identifiers, (b) reasonably secure methods of assigning and selecting passwords or use of unique identifier technologies such as token devices, and (c) control of data security passwords to ensure such passwords are retained in a format and location that does not compromise the security of the data they protect; (ii) secure access control measures that (a) restrict access to records and files containing Personal Information to those who need such information to perform their job duties, and (b) assign unique identification numbers with passwords to each person with computer access and that are designed to maintain the integrity and security of access controls; (iii) Encryption, as that term is defined herein, of (a) all transmitted records and files containing Personal Information that will travel wirelessly and across public networks, and (b) all Personal Information stored on laptops or other portable devices; (iv) up-to-date firewall protection and operating system security patches reasonably designed to maintain the integrity of Personal Information; and (v) upto-date system security agent software that includes malware protection, up-to-date patches and virus definitions, and is regularly set to receive and deploy the most current security updates.

"**Data Breach**" means the unlawful or unauthorized access, loss, acquisition, destruction, use or disclosure of Personal Information.

"**Encryption**" means the protection of data in electronic or optical form, in storage or in transmission, using (i) an encryption technology that has been adopted by an established standards setting body, including, but not limited to, the Federal Information Processing Standards issued by the National Institute of Standards and Technology, which renders such data indecipherable in the absence of associated cryptographic keys necessary to enable decryptions of such data; and (ii) appropriate management and safeguards of cryptographic keys to protect the integrity of the encryption using guidelines promulgated by an established standards setting body, including, but not limited to, the National Institute of Standards and Technology.

"**Personal Information**" means a natural person's first name and last name or first initial and last name, in combination with one or more of the following data elements that relate to such person: (i) social security number; (ii) date of birth; (iii) taxpayer ID number; (iv) mother's maiden name; (v) home address; (vi) driver's license number or identification card number; (vii) medical information (including but not limited to a person's medical history, treatment, or diagnosis by a treatment provider); or (viii) financial account number, credit or debit card number with or without any required security code, access code, personal identification number or password that would permit access to such person's financial account(s) information.

"**Processing**" (including "process") means receiving, storing, maintaining, handling, collecting, transferring, transmitting, destroying, altering, using, or accessing Personal Information, whether or not by automatic means, in any form including but not limited to electrical, digital, wireless, electromagnetic technology, or written form.

SIEMENS

---

**"Technical and Organizational Security Measures" ("TOSMs")** means the administrative, technical and physical measures designed and implemented to prevent a Data Breach arising out of Processing by Contractor, its Affiliates and Representatives, including but not limited to (i) maintaining data security policies and reasonable restrictions on employees' and contractors' processing of Personal Information within and outside of business premises; (ii) ongoing training of employees and subcontractors; (iii) maintaining technology and other means to monitor and detect a Data Breach and prevent access of Personal Information by terminated employees or contractors; (iv) documenting actions taken in response to annual reviews of TOSMs or a Data Breach; and (v) if applicable, a Computer Security System.

2.    Contractor Obligations

(a) Contractor shall, and shall cause its Affiliates and their respective Representatives to Process Personal Information in accordance with these Requirements and applicable federal, state and local privacy and data security laws. Siemens hereby instructs Contractor, and Contractor hereby agrees, to Process Personal Information as necessary to perform Contractor's obligations under this Agreement and for no other purpose.

(b) Contractor shall, and shall cause its Affiliates and their respective Representatives to implement TOSMs necessary to perform Contractor's obligations under this Agreement. Contractor shall provide Siemens with copies of and/or information concerning Contractor's TOSMs upon request. Siemens shall have the right to conduct onsite inspections and/or audits (at its sole cost upon advance notice during normal business hours under the supervision of a Representative of Contractor) of its TOSMs, and Contractor agrees to cooperate with such inspections or audits.

(c) If Contractor, its Affiliates or its or their respective Representatives electronically store or transmit Personal Information or data that includes Personal Information, Contractor shall implement and maintain a Computer Security System.

(d) Contractor shall notify Siemens immediately of a Data Breach and, at Contractor's cost and expense, assist and cooperate with Siemens concerning any legally-required notifications or disclosures to affected persons and/or government authorities.

(e) Contractor shall not, and shall cause its Affiliates and Representatives not to, transfer any Personal Information through an electronic, non-voice transmission to a person outside of the secure system of Contractor unless Contractor uses Encryption to ensure the security of such electronic submission.

(f) Contractor shall notify Siemens at least thirty (30) days prior to Contractor's movement of any data storage device containing Personal Information beyond the physical controls of Contractor, its Affiliates or their respective Representatives who are bound to these Requirements.

(g) Contractor shall cause each of its Affiliates and its and their respective Representatives who handle Personal Information to be bound to standards no less onerous than these Requirements in a binding written agreement.

(h) Contractor shall return or destroy (at Siemens' election), or cause or arrange for the return or destruction of, all Personal Information, including all originals and copies in any medium and any materials derived from or incorporating such Personal Information, upon the expiration or earlier termination of these Requirements or this Agreement.

**SIEMENS**

3.  Contractor understands and agrees on behalf of itself, its Affiliates and its and their respective Representatives that these Requirements are an integral part of its this Agreement and a violation of any of these Requirements shall be considered a material breach by Contractor entitling Siemens to remedies, including but not limited to, immediate termination of this Agreement without penalty.

4.  These Requirements are incorporated into and made a part of this Agreement between Contractor and Siemens.

## Pro Active Safety System, LLC

### A/R Aging Detail
As of June 12, 2025

| DATE | TRANSACTION TYPE | NUM | CUSTOMER | DUE DATE | AMOUNT | OPEN BALANCE |
|------|------------------|-----|----------|----------|--------|--------------|
| **91 or more days past due** | | | | | | |
| 01/26/2023 | Payment | 20000077570 | Siemens Gamesa | 01/26/2023 | -131,352.00 | -5,106.00 |
| 02/02/2023 | Payment | 2000008382 | Siemens Gamesa | 02/02/2023 | -45,205.00 | -7,760.00 |
| 06/21/2023 | Payment | 2000022543 | Siemens Gamesa | 06/21/2023 | -29,578.00 | -2,112.00 |
| 11/26/2024 | Invoice | 4820 | Siemens Gamesa | 01/25/2025 | 5,533.50 | 5,533.50 |
| 12/10/2024 | Invoice | 4830 | Siemens Gamesa | 02/08/2025 | 6,789.00 | 6,789.00 |
| 12/17/2024 | Invoice | 4838 | Siemens Gamesa | 02/15/2025 | 5,719.50 | 5,719.50 |
| 12/29/2024 | Invoice | 4839 | Siemens Gamesa | 02/27/2025 | 3,720.00 | 3,720.00 |
| 01/12/2025 | Invoice | 4843 | Siemens Gamesa | 03/13/2025 | 3,487.50 | 3,487.50 |
| **Total for 91 or more days past due** | | | | | **$ -180,885.50** | **$10,271.50** |
| **61 - 90 days past due** | | | | | | |
| 01/13/2025 | Invoice | 4845 | Siemens Gamesa | 03/14/2025 | 3,720.00 | 3,720.00 |
| 01/13/2025 | Invoice | 4846 | Siemens Gamesa | 03/14/2025 | 6,975.00 | 6,975.00 |
| 01/13/2025 | Invoice | 4844 | Siemens Gamesa | 03/14/2025 | 7,776.00 | 7,776.00 |
| 01/14/2025 | Invoice | 4847 | Siemens Gamesa | 03/15/2025 | 4,696.50 | 4,696.50 |
| 01/20/2025 | Invoice | 4850 | Siemens Gamesa | 03/21/2025 | 4,650.00 | 4,650.00 |
| 01/20/2025 | Invoice | 4849 | Siemens Gamesa | 03/21/2025 | 6,045.00 | 6,045.00 |
| 01/20/2025 | Invoice | 4851 | Siemens Gamesa | 03/21/2025 | 7,719.00 | 7,719.00 |
| 01/20/2025 | Invoice | 4848 | Siemens Gamesa | 03/21/2025 | 8,064.00 | 8,064.00 |
| 01/27/2025 | Invoice | 4854 | Siemens Gamesa | 03/28/2025 | 4,743.00 | 4,743.00 |
| 01/27/2025 | Invoice | 4853 | Siemens Gamesa | 03/28/2025 | 5,952.00 | 5,952.00 |
| 01/27/2025 | Invoice | 4855 | Siemens Gamesa | 03/28/2025 | 6,045.00 | 6,045.00 |
| 01/27/2025 | Invoice | 4856 | Siemens Gamesa | 03/28/2025 | 8,064.00 | 8,064.00 |
| 02/09/2025 | Invoice | 4859 | Siemens Gamesa | 04/10/2025 | 3,906.00 | 3,906.00 |
| 02/09/2025 | Invoice | 4860 | Siemens Gamesa | 04/10/2025 | 3,999.00 | 3,999.00 |
| 02/09/2025 | Invoice | 4861 | Siemens Gamesa | 04/10/2025 | 6,045.00 | 6,045.00 |
| 02/09/2025 | Invoice | 4862 | Siemens Gamesa | 04/10/2025 | 8,064.00 | 8,064.00 |
| 02/11/2025 | Invoice | 4867 | Siemens Gamesa | 04/12/2025 | 3,168.00 | 3,168.00 |
| 02/11/2025 | Invoice | 4866 | Siemens Gamesa | 04/12/2025 | 3,456.00 | 3,456.00 |
| 02/11/2025 | Invoice | 4864 | Siemens Gamesa | 04/12/2025 | 4,650.00 | 4,650.00 |
| 02/11/2025 | Invoice | 4865 | Siemens Gamesa | 04/12/2025 | 5,766.00 | 5,766.00 |
| **Total for 61 - 90 days past due** | | | | | **$113,503.50** | **$113,503.50** |
| **31 - 60 days past due** | | | | | | |
| 02/24/2025 | Invoice | 4871 | Siemens Gamesa | 04/25/2025 | 3,720.00 | 3,720.00 |
| 02/24/2025 | Invoice | 4868 | Siemens Gamesa | 04/25/2025 | 5,487.00 | 5,487.00 |
| 02/24/2025 | Invoice | 4870 | Siemens Gamesa | 04/25/2025 | 5,812.50 | 5,812.50 |
| 02/24/2025 | Invoice | 4869 | Siemens Gamesa | 04/25/2025 | 5,952.00 | 5,952.00 |
| 03/03/2025 | Invoice | 4873 | Siemens Gamesa | 05/02/2025 | 4,650.00 | 4,650.00 |
| 03/03/2025 | Invoice | 4872 | Siemens Gamesa | 05/02/2025 | 6,277.50 | 6,277.50 |
| 03/11/2025 | Invoice | 4874 | Siemens Gamesa | 05/10/2025 | 1,488.00 | 1,488.00 |
| 03/11/2025 | Invoice | 4875 | Siemens Gamesa | 05/10/2025 | 3,720.00 | 3,720.00 |
| 03/11/2025 | Invoice | 4876 | Siemens Gamesa | 05/10/2025 | 8,064.00 | 8,064.00 |
| **Total for 31 - 60 days past due** | | | | | **$45,171.00** | **$45,171.00** |
| **1 - 30 days past due** | | | | | | |
| 03/18/2025 | Invoice | 4877 | Siemens Gamesa | 05/17/2025 | 8,544.00 | 8,544.00 |
| 03/27/2025 | Invoice | 4879 | Siemens Gamesa | 05/26/2025 | 3,720.00 | 3,720.00 |
| 03/27/2025 | Invoice | 4878 | Siemens Gamesa | 05/26/2025 | 4,992.00 | 4,992.00 |
| **Total for 1 - 30 days past due** | | | | | **$17,256.00** | **$17,256.00** |
| **TOTAL** | | | | | **$ -4,955.00** | **$186,202.00** |