**IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLORIDA**

**CASE NUMBER 6:25-cv-1063-ACC-RMN**

**PRO ACTIVE SAFETY SYSTEM P.A.S.S. LLC.,**

**Plaintiff,**

**vs.**

**SGRE GAMESA RENEWABLE ENERGY, LLC.,**

**Defendants.**
______________________________________/

## THIRD AMENDED COMPLAINT

**COMES NOW**, Plaintiff, PRO ACTIVE SAFETY SYSTEM P.A.S.S. LLC., (hereinafter PRO ACTIVE or Plaintiff or P.A.S.S.) by and through its attorneys and sues Defendant, SGRE GAMESA RENEWABLE ENERGY, LLC., (hereinafter SGRE or Defendant or SIEMENS) for violation of DTSA, 18 U.S.C. section 1836 *et. seq*. and allege as follows:

## INTRODUCTION

1. This is cause of action brought pursuant to DTSA, 18 U.S.C. section 1836 *et. seq. and* 1839.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over this dispute because this Complaint brings a Federal Cause of Action pursuant to 18 U.S.C. sec 1836, 1839

*et. seq*. (2024) and seeks damages which exceed One Hundred Thousand Dollars ($100,000.00).

3. This Honorable Court has original jurisdiction of this action as 28 U.S.C. sec. 1331 grants federal courts original jurisdiction of federal questions. Venue is proper in the Middle District of Florida because PRO ACTIVE SAFETY SYSTEM P.A.S.S. LLC.'S (hereinafter PRO ACTIVE or Plaintiff) is a Limited Liability Company with a principal place of business in the Middle District of Florida. All of PRO ACTIVE members, including DAVID BARNARD and SUSAN JIMINEZ are residents of and domiciled in the Middle District of Florida. The cause of action arose in Melbourne, Florida.

4. Defendant, SGRE GAMESA RENEWABLE ENERGY, LLC. (hereinafter SGRE or Defendant or SGRE) is a Delaware Limited Liability Corporation with one listed member, which is SGRE ENERGY, INC., which is a Delaware corporation that does not have a principal place of business in the State of Florida.

**FACTS APPLICABLE TO ALL COUNTS**

5. PRO ACTIVE and SGRE entered into a multi-year open ended contract in 2018 with a 2023 addendum. Pursuant to the Contract and Addendum PRO ACTIVE was bound to perform safety and maintenance services utilizing its trade secrets for wind turbines built by SGRE all across the United States and internationally using PRO ACTIVE'S "**safety system**" trade secrets. PRO ACTIVE utilized it specialized

"safety system" which is a compilation trade secret for SGRE. Both the contract and addendum are attached to this Complaint as Composite Exhibit B. SGRE engaged in theft of Plaintiff's trade secrets in the State of Florida and throughout the United States, when it hired Plaintiff's employees and stole trade secrets from PRO ACTIVE in direct violation of Federal law. SGRE conspired to steal PRO ACTIVE's trade secrets by hiring PRO ACTIVE employees and obtained Plaintiff's trade secrets from them by inducing PRO ACTIVE's prior employees to give these secrets to SGRE and to violate the confidentiality contracts they had with their former employer PRO ACTIVE, which required those employees to keep PRO ACTIVE'S trade secrets confidential. The employees were then utilized to steal PRO ACTIVE'S trade secrets in an attempt to replicate PRO ACTIVES trade secrets and business. SGRE used PRO ACTIVE'S trade secrets once they were taken as described herein. The trade secrets described herein had independent economic value as proven by the fact that Plaintiff spent a great deal of time and capital creating this trade secret system and Defendant paid PRO ACTIVE millions of dollars over the course of 7 years for use of Plaintiff's trade secrets through the Subcontracting Agreement attached to the Complaint. Third party companies also wanted to purchase Plaintiff's safety system as it was a valuable trade secret. The proprietary SAFETY SYSTEM was developed by Plaintiff through years of field development, incident analysis,

technician performance evaluation, live operation refinement, and real time continuous modifications as more fully described herein.

6. Plaintiff's trade secrets were created and developed by one of Plaintiff's board members, DAVID BARNARD, which are best defined as a compilation trade secret and or a system. Plaintiff utilized military and law enforcement experience and training methods, and his experience and combined military and law enforcement training to assess risks, anticipate threats, create and implement preventative safety measures in a real world civilian environment. Plaintiff created a non-obvious compilation of techniques, methods, as described herein, which comprises Plaintiff trade secrets, which were valuable as evidenced by the fact that SGRE compensated Plaintiff millions of dollars for use of these trade secrets. David Barnard was the sole individual possessing unrestricted and complete access to the entirety of the proprietary PRO ACTIVE behavioral-based safety system. No employee, technician, field supervisor, manager, or operational personnel of PRO ACTIVE was provided unrestricted access to the complete operational architecture, implementation framework, deployment-management systems, workforce-accountability structures, operational oversight methods, escalation systems, behavioral-engagement methodologies, pricing systems, operational integration procedures, and proprietary methodologies comprising the full PRO ACTIVE . system. Managers routinely contacted David Barnard directly regarding

implementation issues, deployment decisions, workforce-accountability concerns, hazard-recognition matters, staffing issues, and operational problems in order to obtain guidance regarding what portions of the PRO ACTIVE system should be implemented under specific project circumstances. The complete operational architecture and integrated implementation structure remained under the centralized control and oversight of David Barnard at all relevant times.

7. Upon information and belief, SGRE recognized that PRO ACTIVE trained personnel possessed prior field-tested implementation experience, deployment-management familiarity, workforce-accountability training, operational oversight experience, and practical operational knowledge relating to portions of the proprietary PRO ACTIVE behavioral-based safety system. By recruiting personnel already trained and operationally integrated into the PRO ACTIVE system, SGRE avoided substantial costs associated with independently developing, refining, testing, implementing, and training personnel on comparable workforce-accountability systems, deployment-management procedures, operational oversight methods, and behavioral-based safety methodologies, which were Plaintiff's trade secrets. Plaintiff's trade secrets taken by Defendant include but are not limited to: (1) a training system developed with employee interaction frameworks; (2) a structured sequence of employee interactions, specific timing, and escalation protocols; (3) Customized language frameworks used in communications, decision

making criteria based on employee responses; (4) a repeatable method for ensuring safe execution of duties through non-public techniques. All this created a unique safety system which is the protectable trade secret.

8. Specific examples of the safety system trade secrets stolen by SGRE from Plaintiff are as follows: protocols that change on a technician to technician and supervisor to technician communications during high risk maintenance operations; proprietary escalation timing methodologies when operation hazards require work stoppage, supervisory intervention, crew reassignment, or elevated safety review; proprietary communication protocols that customize terminology behavioral cue recognition, response triggered instruction methodologies designed to reduce operation error and reduce/eliminate incidences; proprietary instructions that assist technician in determining escalation pathways, task continuation authority, hazard reassessment requirements and crew deployment modifications.

9. PRO ACTIVE employees that were stolen by SGRE were used to replicate Plaintiff's business, so SGRE no longer had to pay Plaintiff. SGRE also embedded itself in Plaintiff's operational structure, directly interacted with Plaintiff's employees outside normal coordination as a form of corporate espionage; requested proprietary operational information and trade secrets from Plaintiff's employees, recruited Plaintiff's most skilled, knowledgeable and those with the most knowledge of the PASS safety system and its implementation, and talented employees to

transition Plaintiff's operations to SGRE. SGRE personnel also attended Plaintiffs meetings, reviewed Plaintiffs manuals and proprietary materials, and otherwise observed Plaintiffs implementation of its trade secrets and converted them to their own use.

10. PRO ACTIVE made a reasonable attempt to keep the trade secrets confidential by having employees sign confidentiality contracts, updating and maintaining employee handbooks with policies protecting proprietary information, and utilizing password restrictions on all computers, phone and similar devices and having disciplinary consequences if the policies were not followed.

11. For instance, PRO ACTIVE sent a letter to former employee Chris Menendez on May 27th, 2022, who was hired by SGRE demanding he cease and desist any and all employment with Defendant SGRE, whereby PASS's trade secrets which had independent economic value were converted by SGRE for its own use. PRO ACTIVE also sent demand letters to: (1) Jonathan Zavala on June 17th, 2022; (2) Joshua Conner on June 17th, 2022; and (3) Dylan Menendez on June 17th, 2022, with the same demand.

12. SGRE used the trade secrets stolen from Plaintiff to further its own economic interests to the detriment of PRO ACTIVE. SGRE did this by slowly stealing Plaintiff's employees and Plaintiff's trade secrets until SGRE had completely converted Plaintiff's trade secrets, business, and former PRO ACTIVE

employees to its own use by replicating Plaintiff's business. The economic value of Plaintiff's trade secrets converted by SGRE was at a minimum over 1 million dollars annually and took DAVID BARNARD years to develop and maintain.

13. Simply stated, SGRE stole Plaintiffs trade secrets and employees and replicated Plaintiffs business utilizing those trade secrets and employees. Plaintiff's business and then completely cut out. SGRE further acted in bad faith towards Plaintiff by intentionally withholding[1] over a million dollars of payments owed to Plaintiff by SGRE to financially cripple and destroy Plaintiffs business,[2] while also stealing its trade secrets and employees. PRO ACTIVE was harmed when SGRE improperly solicited and hired these employees who had trade secrets and other confidential information and then stole those trade secrets, causing PRO ACTIVE money damages in lost training, lost revenues, and other damages. SGRE then used those employees to steal PRO ACTIVE's trade secrets described herein. SGRE then

[1] Peter Lukins testified that SGRE withheld approximately $700,000 on one occasion and approximately $1.3 million on another occasion. In addition, SGRE withheld approximately $189,000 in January 2025.

[2] SGRE repeatedly withheld substantial sums owed to PRO ACTIVE during the parties' business relationship. SGRE withheld approximately $700,000 in 2022 and approximately $1.3 million in 2023. In addition, SGRE withheld approximately $189,000 in January 2025, at a time when PRO ACTIVE was already experiencing severe financial pressure resulting from the loss of personnel, workforce replacement expenses, and increased training costs associated with replacing personnel recruited by SGRE. These repeated withholding actions had the ability to financially cripple PRO ACTIVE on multiple occasions and substantially impaired PRO ACTIVE'S ability to meet payroll obligations, recruit and train replacement personnel, maintain operations, and continue servicing projects. SGRE encouraged and benefited from PRO ACTIVE'S expansion and integration into SGRE operations over a period of years and was fully aware that PRO ACTIVE was increasing its workforce, dedicating personnel, investing substantial resources in employee development, and creating operational reliance upon the continuation of the parties' business relationship.

The repeated withholding of funds was a substantial contributing factor to the financial collapse of PRO ACTIVE and occurred while PRO ACTIVE was simultaneously incurring significant expenses associated with replacing personnel recruited and hired by SGRE.

charged PRO ACTIVE approximately $10,300 per employee to train new PRO ACTIVE employees to replace the ones SGRE improperly solicited and hired.

14. A partial list of employees that SGRE used to steal trade secrets from Plaintiff when it improperly solicited and hired them from PRO ACTIVE from 2022 to present include but are not limited to: (1) Chris Mendez; (2) Dylan Mendez; (3) Roscon Ramiro; (4) Craig Kalchi; (5) Jeremis Perryman; (6) Jonathan Zavala; (7) James Bonham; and (8) Amanda Mcaulay; (9) and others not identified herein. These employees were then required to utilize the Plaintiff's trade secrets for the benefit SGRE. Defendant utilized Plaintiff's trade secrets in interstate and international commerce causing money damages to Plaintiff. PRO ACTIVE complained to SGRE about soliciting and hiring PRO ACTIVE employees and stealing PRO ACTIVE trade secrets in direct violation of the law and was told by SGRE management that if they did not like SGRE soliciting and hiring PRO ACTIVE employees in violation of the law that PRO ACTIVE could "just sue" SGRE.

15. SGRE required PRO ACTIVE personnel to complete extensive SGRE-specific training and qualification programs before being eligible for deployment on SGRE projects. Many of these training requirements were imposed by SGRE and were not otherwise required by OSHA, federal regulations, or applicable state regulations. PRO ACTIVE was required to bear the costs associated with these training requirements in order to provide qualified personnel for SGRE projects.

SGRE also engaged in a classic bait and switch tactic with the consumer PRO ACTIVE in the following manner. When PRO ACTIVE initially contracted with SGRE, in 2018, it was understood that PRO ACTIVE employees would require specific training approved by SGRE. SGRE had a list of trainers which allowed PRO ACTIVE employees to receive the proper training approved by SGRE from third parties at a low cost, which was the bait to keep PRO ACTIVE as a consumer and contractor.

16. The Contract between PRO ACTIVE and SGRE, Exhibit A, has a specific page attached as Exhibit D to that Contract entitled "Training Course Requirements which states "[t]echnicians shall be certified as trained in safety & technical classes at all times during the provision of Services, and such certifications must be current at the time Services are performed." (See Exhibit A, page 31). When the Contract initially began in 2018, PRO ACTIVE would pay third parties or SGRE approximately $1500 to $2000 to train employees in compliance with the SGRE contract. In 2021 SGRE began to solicit and hire key PRO ACTIVE employees who had been trained by PRO ACTIVE, and whose training had been paid for by PRO ACTIVE, SGRE then changed the training requirements for new PRO ACTIVE employees and now demanded that PRO ACTIVE pay SGRE approximately $10,300 per employee for SGRE to train new employees to meet the new requirements of SGRE as evidence by SGRE's own documents.

17. Shockingly, PRO ACTIVE incurred this $10,300 cost to train new hires (technicians) to replace PRO ACTIVE'S employees that SGRE hired in direct violation of the law. Defendant took Plaintiffs trade secrets and employees and replicated Plaintiffs business, thereby putting Plaintiff out of business costing Plaintiff millions of dollars. KIP WOODWORTH, Resource Manager employed by PRO ACTIVE, tried to resolve this issue with SGRE, and was told that paying SGRE approximately $10,300 to train employees was now the only option PRO ACTIVE could use to train employees. Discovery has established that SGRE's required technician training cost approximately $10,300 per employee before considering associated travel expenses, lodging, per diem, wages paid during training, rental vehicles, airfare, and related deployment expenses. When these additional expenses are included, the actual replacement cost incurred by PRO ACTIVE was approximately $12,500 per technician. After PRO ACTIVE paid SGRE approximately $10,300 per employee in required training costs, plus associated travel, lodging, per diem, and wage expenses, SGRE improperly solicited and hired those newly trained employees. SGRE then utilized those employees to obtain additional confidential and proprietary information, trade secrets, operational methods, implementation practices, business intelligence, and know-how belonging to PRO ACTIVE, further advancing SGRE'S efforts to replicate and internalize functions previously performed by PRO ACTIVE.

18 PRO ACTIVE struggled to pay SGRE the around $10,300 per employee to train new PRO ACTIVE employees leading to SGRE attempting to partner with others to pay the training costs. SGRE improperly solicited and hired PRO ACTIVE'S trained employees that had some of PRO ACTIVE's trade secrets and used those employees to steal additional trade secrets from PRO ACTIVE by having these employees replicate PRO ACTIVE'S safety system for SGRE. SGRE has a history, policy and practice of misappropriating trade secrets and has been found liable for doing so in both federal and civil cases throughout the United States. These former instances include but are not limited to *United States v. SGRE Energy, Inc*., No. 3:24-cv-141 (E.D. Va. 2024); *General Electric Co. v. SGRE Energy, Inc*. Case No. 3:21-cv-00051 (E.D. Va. 2021); *Mitsubishi Hitachi Power Systems Americas, Inc. v. SGRE Energy, Inc*. Case No. 6:20-cv-01845 (M.D. Fla. 2020). These cases are relevant to the facts of this case, as it shows that this is the manner in which Defendant conducts business and has a policy and/or practice of misappropriating trade secrets as done to Plaintiff. Specifically, SGRE unlawfully interfered with PRO ACTIVE's established contracts, recruited away key employees, stole trade secrets, and exploited confidential proprietary safety management data developed by PRO ACTIVE through years of experience and private investment. The resulting damages include total operational disruption and loss of market position within the energy sector—harm consistent with the conduct prohibited under the Defend Trade Secrets

Act (18 U.S.C. §1832, *et. seq.*) Plaintiff spent over a million dollars in man hours creating the know-how and specific trade secrets that were stolen by Defendant as described herein.

19. Plaintiff created and utilized a Policy and Procedure manual, (attached hereto and incorporated herein as Exhibit B) which included a skeletal outline of the PRO ACTIVE SAFETY SYSTEM's "trade secrets" on page 18, and other proprietary information, which was improperly taken by Defendant and utilized by Defendant.[3] The Policy and Procedure manual also required Plaintiff's employees to protect Plaintiff's trade secrets which include but are not limited to developed Job Safety Analysis, training curricula, high-skill technician procedures, client pricing schedules, deployment checklists, and site-specific safety protocols, and other operational know-how, which were trade secrets and were kept confidential by Plaintiff. Employees of PRO ACTIVE were required to sign an Employment Contract and an Employee Handbook (an exemplar is attached as Exhibit C) which required the employee to keep trade secrets and other proprietary information confidential. Defendant induced employees to breach these confidentiality clauses when it hired Plaintiff's employees and induced them to convert Plaintiff's trade

[3] The written manuals did not embody the entirety of the P.A.S.S. behavior-based safety system. The proprietary value of the system arose from the implementation methods, workforce-accountability procedures, deployment decisions, escalation protocols, operational judgment, behavioral-engagement methodologies, and management oversight developed and maintained by PRO ACTIVE. The System can be utilized to elevate an existing system that is in place.

secrets to the benefit of the Defendant. PRO ACTIVE enforced its confidentiality and no compete agreements against former employees.

**COUNT I: VIOLATION OF DTSA**

20. The Plaintiff reaffirms and realleges paragraphs one (1) through nineteen (19) as fully incorporated and set forth herein. The Plaintiff sues SGRE for theft of trade secrets pursuant to 18 U.S.C. sec 1836 *et. seq.* (2024), which is also known as the DTSA.

21. Under DTSA, "the term 'trade secret' means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if" (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

22. The proprietary and confidential trade secret information developed, owned, maintained, implemented, refined, and utilized by PRO ACTIVE included specific

operational systems, integrated implementation structures, workforce-deployment systems, behavioral-based safety methodologies, deployment-management systems, project-coordination structures, technician-management procedures, operational oversight systems, workforce-accountability frameworks, operational integration methods, deployment architectures, and training frameworks developed by David Barnard through years of field implementation, operational refinement, testing, workforce development, project deployment, and practical operational management within the wind-energy and industrial safety sectors.

23. The proprietary PRO ACTIVE behavioral-based safety system was not merely a generalized safety concept or ordinary industry practice. Instead, it constituted a field-tested system, operationally implemented, integrated workforce-accountability and operational-safety-management system which was developed, refined, tested, implemented, coordinated, and operationally deployed through years of practical field operations, workforce supervision, operational refinement, project implementation, workforce development, operational testing, deployment coordination, hazard-recognition, management, behavioral-accountability integration, and real-world project execution by PRO ACTIVE under the direction and oversight of David Barnard.

24. The proprietary PRO ACTIVE behavioral-based **safety system** developed by David Barnard provided measurable operational value and produced demonstrable real-world operational and safety results.

25. During the period in which PRO ACTIVE fully implemented and managed the complete PRO ACTIVE system on Mesa Transmission Line Company operations, the project reportedly experienced no recordable injuries and no fatal incidents.[4]

26. The operational history demonstrates that the proprietary PRO ACTIVE behavioral-based safety system possessed measurable operational value, independent economic value, implementation value, competitive value, and demonstrable field-tested performance advantages arising from the integrated operational methods, deployment-management systems, workforce-accountability structures, implementation systems, operational oversight methods, project-coordination systems, and workforce-management procedures developed and maintained by PRO ACTIVE.

27. While certain isolated safety concepts, operational procedures, or workforce-management practices may independently exist within the industry, the proprietary trade-secret value of the PRO ACTIVE behavioral-based safety system arose from

[4] The Mesa Transmission Line Company deployment demonstrates that the P.A.S.S. system was not theoretical, but instead a field-tested and operationally implemented system producing measurable real-world safety and operational results.) Six months after P.A.S.S. left the project with Mesa Line, another safety company came in with a plan; one death and one severe injury, OSHA cited Mesa for multiple serious violations.

the unique integration of numerous safety concepts, operational procedures, and workforce management practices.

28. The integrated operational architecture and coordinated implementation systems comprising the proprietary PRO ACTIVE behavioral-based safety system were not publicly known, were not generally available within the industry, and were developed through years of operational refinement, workforce development, field testing, deployment management, hazard-recognition implementation, workforce-accountability integration, operational oversight, and practical project implementation under the direction and oversight of David Barnard.

29. The PRO ACTIVE system derived independent economic value, reduced deployment delays, reduced workforce-training time, improved project-startup efficiency, enhanced workforce accountability, minimized operational disruption, improved workforce integration, enhanced deployment coordination, improved operational oversight, improved project-management effectiveness, and enabled rapid deployment of qualified personnel to active industrial and wind-energy projects.

30. PRO ACTIVE invested substantial time, labor, management resources, workforce-development resources, operational experience, military operational training, law-enforcement training, field testing, implementation efforts, deployment refinement, workforce supervision, project implementation efforts, and financial

resources over multiple years in developing, refining, testing, implementing, maintaining, coordinating, and operationally deploying the proprietary PRO ACTIVE behavioral-based safety system and associated operational methodologies.

31. The proprietary PRO ACTIVE behavioral-based safety system was further refined through David Barnard's operational field experience, including service in the United States Marine Corps, Army Ranger training and service, law-enforcement experience as a police officer, attendance at the San Diego Police Academy, the California Marshal Academy, and the Tampa Police Academy, together with extensive industrial field operations, workforce-management experience, behavioral-accountability implementation, operational oversight, and large-scale industrial and wind-energy project safety oversight.

32. The PRO ACTIVE behavioral-based safety system and associated proprietary operational systems were not publicly disclosed and were treated internally as confidential and proprietary business information belonging exclusively to PRO ACTIVE.

33. PRO ACTIVE did not provide any single employee unrestricted or complete access to the entirety of the proprietary PRO ACTIVE behavioral-based safety system developed by David Barnard. The PRO ACTIVE system was intentionally compartmentalized and maintained through restricted operational access. Employees, technicians, field supervisors, managers, and operational personnel were

provided access only to those portions of the proprietary system necessary to perform their specific operational responsibilities on active projects. SGRE was required to hire many different employees from PRO ACTIVE, to try and piece of the pieces of PRO ACTIVE'S trade secret together because of this compartmentalization.

34. The complete operational architecture, implementation structure, deployment systems, workforce-accountability framework, operational oversight systems, deployment-management methods, training structures, pricing systems, workforce-coordination systems, escalation procedures, operational integration methods, and proprietary methodologies comprising the full PRO ACTIVE behavioral-based safety system remained under the centralized control and oversight of David Barnard.

35. Selected field managers were provided limited operational guidance regarding specific implementation procedures only when operational, workforce, safety, staffing, deployment, or project-related issues required management coordination or operational problem resolution.

36. PRO ACTIVE intentionally limited dissemination of the complete proprietary PRO ACTIVE behavioral-based safety system in order to maintain the confidentiality, secrecy, proprietary nature, independent economic value, operational

value, implementation value, and competitive value of the system and its associated operational methodologies.

37. PRO ACTIVE took reasonable measures to maintain the secrecy and confidentiality of the foregoing trade-secret information, including requiring confidentiality provisions within employment agreements and employee handbooks, restricting internal operational access.

38. PRO ACTIVE also took reasonable measures to maintain secrecy by limiting dissemination of implementation methods to authorized personnel, maintaining centralized implementation oversight through David Barnard and selected management personnel, limiting operational disclosure to SGRE personnel strictly as necessary for active project coordination, and maintaining proprietary operational systems, deployment-management procedures, workforce-accountability systems, operational oversight structures, and implementation methodologies internally within PRO ACTIVE. PRO ACTIVE also placed password restrictions on devices and computers to protect its trade secrets.

39. Thie proprietary operational system was not publicly disclosed and was maintained internally as confidential and proprietary operational business information belonging exclusively to PRO ACTIVE.

40. SGRE was never provided unrestricted access to PRO ACTIVE's safety system complete operational architecture, implementation framework, deployment

systems, operational structure, workforce-accountability framework, operational oversight systems, deployment-management systems, workforce-coordination structures, escalation systems, pricing systems, training structures, operational integration procedures, or proprietary methodologies comprising the full proprietary PRO ACTIVE behavioral-based safety system developed by David Barnard.

41. Any exposure SGRE personnel had to portions of the PRO ACTIVE system occurred only through limited operational interaction with PRO ACTIVE personnel during active project performance.

42. Upon information and belief, SGRE personnel directly interacted with PRO ACTIVE personnel utilizing portions of the proprietary PRO ACTIVE behavioral-based safety system during active project operations.

43. Upon information and belief, SGRE directly observed and recognized the operational effectiveness, deployment advantages, implementation value, workforce-accountability benefits, workforce-integration efficiencies, operational oversight improvements, operational-management effectiveness, and practical operational advantages associated with portions of the proprietary PRO ACTIVE behavioral-based safety system through SGRE' interaction with PRO ACTIVE personnel and operations on SGRE-controlled projects.

44. Each former PRO ACTIVE employee and technician subsequently recruited and hired by SGRE possessed partial operational exposure to limited portions of the proprietary PRO ACTIVE behavioral-based safety system.

45. Upon information and belief, SGRE obtained substantial operational and economic benefit from recruiting and hiring PRO ACTIVE trained personnel who possessed the trade secret and prior operational familiarity, implementation exposure, training exposure, field-tested experience, workforce-accountability integration familiarity, deployment-management experience, operational oversight familiarity, and practical operational knowledge relating to portions of the proprietary PRO ACTIVE behavioral-based safety system and associated operational methodologies developed by PRO ACTIVE.

46. Upon information and belief, SGRE recognized that PRO ACTIVE personnel had already been trained and had practical experience in utilizing portions of the proprietary PRO ACTIVE behavioral based safety system.

47. In this case, PRO ACTIVE'S employees possessed trade secrets developed by Plaintiff that had independent economic value, and PRO ACTIVE took reasonable steps to keep it secret by requiring employees to sign confidentiality contracts. SGRE converted and stole Plaintiffs trade secrets as discussed above when it hired employees who had the confidential and proprietary information and

trade secrets, and SGRE utilized those employees and these trade secrets for its own use to the detriment of the Plaintiff.

48. Specific examples of trade secrets or system stolen by SGRE from Plaintiff are as follows: protocols that change on a technician to technician and supervisor to technician communications during high risk maintenance operations; proprietary escalation timing methodologies when operation hazards require work stoppage, supervisory intervention, crew reassignment, or elevated safety review; proprietary communication protocols that customize terminology behavioral cue recognition, response triggered instruction methodologies designed to reduce operation error and reduce/eliminate incidences; proprietary instructions that assist technician in determining escalation pathways, task continuation authority, hazard reassessment requirements and crew deployment modifications. Other trade secrets SGRE stole from Plaintiff include workforce and personnel contact information, needs and preferences and job/employee specific protocols, and other trade secrets that SGRE improperly took from PRO ACTIVE as described herein. *See James B. Oswald Company v. Neate,* 98 F.4th 666 (6th Circuit 2024).

49. PRO ACTIVE employees who were poached by SGRE were used to replicate Plaintiff's business so SGRE could then functionally steal the business from Plaintiff. SGRE also embedded itself in Plaintiff's operational structure, directly interacted with Plaintiff's employees outside normal coordination; requested

proprietary operational information and trade secrets from Plaintiff's employees, recruited Plaintiff's employees who were most knowledge on the PRO ACTIVE trade secret system to transition Plaintiff's operations to SGRE. SGRE also attended Plaintiffs meetings, reviewed Plaintiffs manuals and proprietary materials, and otherwise observed Plaintiffs implementation of its trade secrets and converted it to their own use and implemented the system in their operations.

50. PRO ACTIVE made a reasonable attempt to keep the trade secrets confidential by having employees sign confidentiality contracts, maintaining employee handbooks with policies, protecting proprietary information, and utilizing password restrictions on all computers, phone and similar devices and having disciplinary consequences if the policies were not followed.

51. Plaintiff created and utilized a Policy and Procedure manual which included trade secrets, and other proprietary information, which was improperly taken by Defendant. The Policy and Procedure manual also required Plaintiff's employees to protect Plaintiff's trade secrets which include but are not limited to developed Job Safety Analysis, training curricula, high-skill technician procedures, client pricing schedules, deployment checklists, and site-specific safety protocols, and other operational know-how, which were trade secrets and were kept confidential by Plaintiff. Employees of PRO ACTIVE were required to sign an Employment Contract and an Employee Handbook which required the employee to

keep trade secrets and other proprietary information confidential. PRO ACTIVE maintained its confidentiality requirements, its employee handbook[5] and operated on password protected networks and systems. Defendant induced employees to breach these confidentiality clauses when it hired Plaintiff's employees and induced them to convert Plaintiff's trade secrets to the benefit of the Defendant.

52. After SGRE stole Plaintiff's trade secrets, employees and replicated PRO ACTIVE'S business, SGRE began to starve PRO ACTIVE by not paying PRO ACTIVE monies owed. At one point SGRE owed PRO ACTIVE between 1 to 2 million dollars as the final nail in the coffin to financially devastate PRO ACTIVE. PRO ACTIVE was unable to pay its operating costs because SGRE intentionally refused to pay PRO ACTIVE, in an attempt to squeeze out PRO ACTIVE.

53. PRO ACTIVE'S trade secret, among other things, is that they took SGRE's existing protocols, policies, and procedures, and applied PRO ACTIVE'S trade secret to SGRE's existing system.[6] Stated another way, all breaded fried chicken is

---

[5] The manuals were updated, and violations of these manuals was enforced.

[6] The proprietary P.A.S.S. behavioral-based safety system was not derived from any single safety rule, industry standard, or publicly available procedure. Rather, it consisted of a unique and non-public integration of workforce-accountability systems, behavioral-engagement methodologies, hazard-recognition procedures, deployment-management structures, escalation protocols, operational oversight systems, communication frameworks, and project-coordination methods developed, refined, tested, and implemented by PRO ACTIVE over many years of active field operations.

The proprietary value of the P.A.S.S. system arose from the manner in which these individual components were coordinated, sequenced, integrated, and operationally deployed as a unified workforce-accountability and safety-management framework. The complete system was not publicly known, was not commercially available, and could not be readily duplicated without access to PRO ACTIVE'S proprietary implementation methods, operational experience, field-tested procedures, and internal management systems.

breaded yet KFC took that basic recipe and created a new and better trade secret, with their 11 herbs and spices. In much the same way the KFC created a trade secret from the basic recipe of fried chicken, PRO ACTIVE has applied their trade secrets described herein to SGRE's basic procedures elevating the process and creating value by improved safety for each and every job site.

54. As a direct and proximate result of SGRE'S actions as described and set forth herein, PRO ACTIVE suffered damages due to lost revenues, employee replacement costs, loss of enterprise value, and the sale to a foreign company and demands from SGRE, including costs and attorney's fees.

**WHEREFORE**, the Plaintiff prays this Honorable Court award money damages, punitive damages, costs, attorney's fees, against SGRE and all other relief that is just and proper and a TRIAL BY JURY.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by Jury for all Counts herein.

**s//Gary Holland//**
Gary Holland, ESQ.
Florida Bar No.:860610
997 S. Wickham Road
Melbourne, Florida 32904
Phone: (321) 728-4911

Through years of operational refinement, workforce development, field testing, project implementation, and practical deployment, PRO ACTIVE transformed these integrated methodologies into a proprietary operational system that provided measurable safety, workforce-accountability, deployment-efficiency, and operational-performance advantages, thereby creating independent economic value and a competitive advantage within the wind-energy and industrial-safety industries.

garyholland@brosslawoffice.com
susan@brosslawoffice.com
paul@brosslawoffice.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished by e-service and PACER to all parties, this 5th day of JUNE 2026.

**s//Gary Holland//**
Gary Holland, ESQ.
Florida Bar No.:860610
997 S. Wickham Road
Melbourne, Florida 32904
Phone: (321) 728-4911
gholland@brosslawoffice.com
paul@brosslawoffice.com